Jeanne ROBINSON; David J. Marc,
Plaintiffs–Appellants,

v.

George G. BALOG; Robert Guston, Bureau Head; Leonard H. Addison, Bureau Head; Mayor and City Council of Baltimore, Defendants–Appellees.

No. 97–2203.

United States Court of Appeals,
Fourth Circuit.

Argued June 3, 1998.

Decided Nov. 12, 1998.

**ARGUED:** Howard J. Schulman, Schulman & Kaufman, L.L.C., Baltimore, Maryland, for Appellants. Benjamin Winfield Hahn, Annapolis, Maryland, for Appellees. **ON BRIEF:** John W. Kyle, Annapolis, Maryland; Michael G. Raimondi, George Philippou, Baltimore, Maryland; H. Mark Stichel, Gohn, Hankey & Stichel, L.L.P., Baltimore, Maryland; William R. Phelan, Jr., Baltimore, Maryland, for Appellees.

Before WILKINSON, Chief Judge, MOTZ, Circuit Judge, and BUTZNER, Senior Circuit Judge.

Affirmed in part, reversed in part, and remanded by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge DIANA GRIBBON MOTZ and Senior Judge BUTZNER joined.

## OPINION

WILKINSON, Chief Judge:

Jeanne Robinson and David Marc sued George Balog, Robert Guston, Leonard Addison, and the Mayor and City Council of Baltimore City, alleging that the defendants

took retaliatory personnel actions against them on the basis of their constitutionally protected speech. The district court granted summary judgment in favor of the defendants. The court held that the three individual defendants were entitled to qualified immunity and that, with respect to municipal liability, the plaintiffs failed to show that the retaliatory conduct was attributable to a custom or policy of the City. Robinson and Marc appeal both rulings.

We hold that a reasonable government official would have known that Robinson and Marc's speech was entitled to constitutional protection under clearly established law at the time. Because the speech concerned the corrupt misuse of public funds, and because plaintiffs were called to provide their statements both by federal law enforcement officers and by a governmental board, it should have been apparent that the speech was constitutionally protected. *See Piver v. Pender County Bd. of Educ.*, 835 F.2d 1076 (4th Cir.1987). We therefore hold that Balog, Guston, and Addison are not entitled to qualified immunity on the basis set forth by the district court. We agree with the district court that the municipal defendant is not liable.

## I.

Plaintiffs Robinson and Marc were employees in the Bureau of Solid Waste (BSW) division of the Baltimore Department of Public Works (DPW). Robinson served as the Acting Division Chief, and Marc as Assistant Chief, of the BSW's Engineering Division. Defendants were high-ranking officials in the DPW. Balog was the Director of the DPW and a member of the Board of Estimates of the City of Baltimore; Guston was the Division Chief of the Office of Permits within the DPW; and Addison became the Head of BSW sometime in November 1995.

The controversy underlying this litigation centered on a leachate pond at the Quarantine Road Landfill in Baltimore. The pond is designed to collect and store toxic run-off generated by water percolating through the landfill. In July 1994, the pond was placed out of service and BSW engineers developed specifications for a contract to repair it. Contract 145, which also included other work on the landfill, was ultimately awarded to L.F. Mahoney, Inc. on March 29, 1995.

Robinson and Marc allege in their complaint that Mahoney received Contract 145 as part of an improper DPW "contractor friendly" policy designed to benefit contractors who made contributions to Mayor Kurt Schmoke's reelection campaign. Plaintiffs claim that Mahoney was not the original low bidder. Instead, the bid process was manipulated through an alteration in the contract specifications in order to make Mahoney the low bidder. Robinson and Marc allege that the bid process was rigged in Mahoney's favor because the company had contributed to the Mayor's reelection campaign. In fact, plaintiffs maintain that Mahoney was primarily a road-paving contractor and had no experience at all in leachate pond repair.

Work commenced at the leachate pond in May 1995. In June, Robinson and Marc became concerned that Mahoney's subcontractor was being paid to haul sediment from the leachate pond even though no such hauling actually was taking place. Robinson and Marc allege that after they raised these concerns they were "kept out of the loop of information concerning the repairs on the leachate pond," and that Balog and Guston specifically warned them to stay away from the landfill. Mahoney completed its work on the leachate pond on August 15, 1995. On August 21, 1995, Guston sent a memorandum to BSW explaining that work had been completed and the pond could be placed back in service.

During the following week BSW personnel observed holes and cracks in the leachate pond's liner, grass growing out of the unsealed cracks, and leachate bubbling out of holes in the newly installed patches. Plaintiffs claim they told defendant Guston of this both verbally and in an August 31, 1995 memorandum. In the memo, Robinson explained that BSW was reluctant to refill the pond unless certain quality assurances could be received. BSW, however, never received such assurances and, accordingly, the pond was not filled.

On September 29, 1995, Robinson and Marc showed their superior—then–Head of BSW Kenneth Strong—a videotape taken that day revealing the condition of the pond. Strong concurred in Robinson and Marc's decision not to refill the pond, and sent three memos to Balog over the next two months expressing that belief. Mayor Schmoke and Balog terminated Strong effective November 24, 1995, and replaced him with defendant Addison. Robinson claims that in November Balog also excoriated her, demanding that she and Marc change their position with respect to the leachate pond. Robinson steadfastly refused, claiming that filling the pond would constitute a public health hazard. By November and December, the local press had learned of the leachate pond controversy and began running articles on both that subject and the sudden termination of Strong.

Balog ultimately decided to seek supplemental appropriations—approximately $41,-000—to pay Mahoney to redo repairs to the pond. Balog concluded that the City—and not Mahoney—should pay for the necessary repairs because Robinson's error in engineering judgment and failure to refill the pond in a timely fashion had caused the damage to the pond. The Board of Estimates of the City of Baltimore convened on December 13, 1995, to consider this appropriations request. DPW presented expert findings that Mahoney satisfactorily performed under the contract and that any damage was caused by hot summer weather after BSW refused to refill the leachate pond. Kenneth Strong—now a private citizen—also appeared at the public meeting to oppose both acceptance of Mahoney's work and any further appropriations on the project. The President of the City Council, Lawrence Bell—who sits on the Board of Estimates—called Robinson and Marc to testify. Before each of their appearances, Robinson and Marc expressed reluctance to appear at the public meeting. They then testified that the serious questions surrounding Mahoney's work and the subsequent failure to produce requested quality assurances led them to oppose refilling the leachate pond. Despite the testimony of Strong, Robinson, and Marc, the Board of Estimates voted to approve the supplemental appropriations request. The

leachate pond was subsequently repaired and placed back in service in 1996.

Later in December 1995, an Assistant United States Attorney (AUSA) contacted Robinson and Marc. The AUSA asked plaintiffs questions concerning the leachate pond controversy and potential racketeering in the DPW. The AUSA also asked Robinson and Marc if they would submit to FBI interviews. Both agreed and subsequently met with an FBI agent. Robinson and Marc maintain that defendants learned of their cooperation with authorities through several sources. First, in June 1996, the Baltimore Sun reported that several current DPW employees were providing information to the FBI in connection with an investigation into the leachate pond controversy. Furthermore, on June 12, 1996, Robinson was subpoenaed to appear before a federal grand jury. Robinson informed Addison that she had been subpoenaed—without indicating the specific reason—and told him that she would have to miss work the day of her appearance before the grand jury. Finally, Robinson and Marc claim that at the time it was widely rumored among DPW personnel that each of the plaintiffs was cooperating with the FBI.

Robinson and Marc maintain that the defendants retaliated against them both for their statements at the December Board of Estimates meeting and their subsequent cooperation with the federal investigation. After their appearance at the Board of Estimates meeting, Robinson and Marc were excluded from staff meetings and overtime snow duty, even though Robinson had been an integral part of the snow program during the prior two winters and had helped plan the program for the 1995–1996 winter. Robinson and Marc claim that the deprivation of such overtime opportunities cost them approximately $10,000 and $3,000 per year respectively. On July 19, 1996, Robinson was relieved of her supervisory duties in the Engineering Division and transferred to the Collections Division. Robinson claims her new role is a "shelf position": in her former capacity she supervised sixty-four employees under an $18 million budget whereas she now directs three employees under a $150,000 budget. Marc was simi-

larly transferred to a "shelf position" and stripped of any supervisory duties. Marc claims he was also forbidden to go to the tenth floor of the municipal building, where Robinson's office was located. Marc's city automobile, parking permit, and laptop computer were also taken away. When Marc subsequently asked to retire early pursuant to the Retirement Incentive Option, his request was denied, even though the requests of similarly situated employees were approved.

Robinson and Marc filed this complaint against Balog, Guston, Addison, and the Mayor and City Council of Baltimore, seeking damages under 42 U.S.C. § 1983 for violation of their rights under the First and Fourteenth Amendments. *See Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Plaintiffs also alleged state law claims. The district court granted defendants' motion for summary judgment on the federal claims and declined to exercise jurisdiction over the state law claims, dismissing them without prejudice. Robinson and Marc now appeal the district court's ruling with respect to their federal claims.

## II.

◼ We first address whether Balog, Guston, and Addison are entitled to qualified immunity on plaintiffs' *Connick* claims. Qualified immunity protects government officials from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see Pinder v. Johnson,* 54 F.3d 1169, 1173 (4th Cir.1995) (en banc). In conducting the immunity inquiry, we look to settled law at the time of the allegedly unconstitutional act. *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727; *Pinder,* 54 F.3d at 1173. As we held in *Wilson v. Layne,* 141 F.3d 111 (4th Cir.1998) (en banc), to determine settled law we ordinarily look to decisions " 'by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state.' " *Id.* at 114 (quoting *Wallace v. King,* 626 F.2d 1157, 1161 (4th Cir.1980)).

Robinson and Marc focus on their statements before the December Board of Estimates meeting and their cooperation with federal officials investigating racketeering in the DPW. The district court concluded that the individual defendants were entitled to qualified immunity in at least three respects. The district court first found that plaintiffs spoke in their capacity as employees and, therefore, their speech was not entitled to constitutional protection. The district court also held that, even if Robinson and Marc did engage in speech as citizens on a matter of public concern, defendants could reasonably have believed that they had a legitimate interest in insisting upon obedience to their workplace decisions. Finally, the district court ruled that it was not clearly established that defendants' retaliatory personnel actions constituted a deprivation of an employee benefit sufficient to implicate plaintiffs' First Amendment rights.

### A.

◼ Robinson and Marc initially contend that the district court erred in holding that their speech was not entitled to constitutional protection. In December 1995, as today, the threshold question was whether an employee's speech "may be 'fairly characterized as constituting speech on a matter of public concern.' " *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (quoting *Connick,* 461 U.S. at 146, 103 S.Ct. 1684). An employer's decision does not become a matter of public concern simply because an employee takes issue with it. As the Supreme Court explained in *Connick,* "government offices could not function if every employment decision became a constitutional matter." 461 U.S. at 143, 103 S.Ct. 1684; *see DiMeglio v. Haines,* 45 F.3d 790, 806 (4th Cir.1995); *Holland v. Rimmer,* 25 F.3d 1251, 1255 (4th Cir.1994). It is not a constitutional matter when an employee "speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest." *Connick,* 461 U.S. at 147, 103 S.Ct. 1684; *see DiMeglio,* 45 F.3d at 805. In determining whether an employee's speech constitutes speech on a matter of public concern, we are

guided by the content, form, and context of the speech in question. *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684; *Stroman v. Colleton County Sch. Dist.*, 981 F.2d 152, 156 (4th Cir.1993).

■ In this case, the confluence of content, form, and context demonstrates that Robinson and Marc's speech addressed matters of public concern. As to content, the speech sought to bring to light "actual or potential wrongdoing or breach of public trust" on the part of government employees. *Connick*, 461 U.S. at 148, 103 S.Ct. 1684; *see Daniels v. Quinn*, 801 F.2d 687, 690 (4th Cir.1986); *Jurgensen v. Fairfax County*, 745 F.2d 868, 879 (4th Cir.1984). In both their testimony before the Board of Estimates and their cooperation with federal officials, Robinson and Marc addressed matters of community concern rather than private complaints. Their testimony before the Board of Estimates concerned allegations that DPW employees knowingly misused public funds in connection with the repair of the leachate pond. Moreover, their testimony revealed that serious environmental hazards could result if the City chose to allocate further funds to the same contractor before subjecting the entire pond repair controversy to greater scrutiny. Robinson and Marc previously expressed concern that refilling the leachate pond would lead to the leaking of toxic runoff into the water table and aquifers, thereby contaminating the public water supply.

Plaintiffs' statements to federal officials also addressed matters of public concern. Both an AUSA and an FBI agent asked plaintiffs for information on improprieties in the repair work at the leachate pond, on potential racketeering in the DPW, and on any other illegal activities observed at the DPW. Robinson and Marc informed federal officials of their belief that serious misrepre-

sentations had been made about the performance of certain repair work, including the presentation of deliberately falsified delivery tickets. Indeed, plaintiffs' concerns were partially driven by their belief that the original bid process for Contract 145 had been rigged in order to award the repair work to Mahoney for its contributions to the Mayor's reelection campaign. In light of the criminal nature of the federal inquiries, plaintiffs' assistance could only have been interpreted as speech helping to uncover "actual or potential wrongdoing or breach of public trust." *Connick*, 461 U.S. at 148, 103 S.Ct. 1684. The district court erred by failing to acknowledge either the relevance of Robinson and Marc's cooperation with federal officials to the qualified immunity inquiry or the serious implications of sanctioning public employees for assisting a federal criminal investigation.[1]

Under *Connick*, we must also examine the form and context of Robinson and Marc's speech. Like the plaintiff in *Piver*, Robinson and Marc spoke at a public meeting called specifically to solicit comments on the subject matter of plaintiffs' speech—here, the leachate pond repair controversy. *See* 835 F.2d at 1081. The fact that the Board of Estimates deemed it essential to hear from each of the plaintiffs in order to reach an informed decision concerning the expenditure of the City's funds supports the view that Robinson and Marc's speech addressed a matter of public importance.

It is clear that by the time the plaintiffs testified before the Board and began cooperating with federal authorities the leachate pond controversy had mushroomed into a matter of public concern. In November and December, local newspapers published numerous articles regarding the leachate pond

---

1. Defendants argue on appeal that there is no evidence that they ever had knowledge of plaintiffs' cooperation with the federal investigation and, therefore, such speech could not have been a motivating factor behind the allegedly retaliatory personnel actions ultimately taken. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The individual defendants moved for summary judgment, however, only on the basis of qualified immunity and presented no evidence

to contradict plaintiffs' claims on the separate causation inquiry. We are therefore presented only with the question of whether, *if defendants did retaliate* against plaintiffs *for* their testimony before the Board of Estimates *and for* their cooperation with the federal investigation, a reasonable government official would have known that such conduct violated plaintiffs' clearly established rights. We believe the district court erred in holding that he would not.

controversy and the seemingly connected termination of plaintiffs' supervisor, Kenneth Strong. Throughout the first half of 1996, the press continued to print stories on potential improprieties surrounding the repair work at the leachate pond, including coverage of the FBI investigation. This public focus therefore paralleled Robinson and Marc's speech, both with respect to subject matter and timing.

Finally, the involuntary nature of plaintiffs' speech supports a finding that it addressed a matter of public concern. When Robinson and Marc appeared before the Board of Estimates, they preceded their testimony with an explanation that neither had elected to testify but rather each had been called by the Board. Lawrence Bell, the President of the City Council, then asked that the record reflect that each was appearing to testify upon Bell's request. Similarly, the AUSA approached Robinson and Marc—and not vice versa. We think this context makes clear that plaintiffs did not cunningly transform a simple employment grievance into a public spectacle. Rather, plaintiffs' speech concerned a true issue of public policy, which was of independent concern both to members of Baltimore's Board of Estimates and to federal law enforcement officials. By responding to the Board's invitation to testify at a public hearing and by cooperating with law enforcement investigators, Robinson and Marc spoke not in their "capacity as ... public employee[s]," *DiMeglio,* 45 F.3d at 805, but as "citizen[s] upon matters of public concern." *Connick,* 461 U.S. at 147, 103 S.Ct. 1684.

In view of the content, form, and context of Robinson and Marc's speech, we therefore hold that it should have been evident to any reasonable government official that the speech addressed a matter of public concern.

**B.**

■ The district court nevertheless held that, even if Robinson and Marc's speech did address a matter of public concern, the defendants were entitled to insist upon Robinson and Marc's obedience to legitimate workplace decisions. Presumably, the district court based this conclusion on its belief that the defendants' interest in the efficient operation of the DPW outweighed plaintiffs' interest in First Amendment expression. The efficient functioning of government offices is a paramount public interest. However, defendants have failed to present any evidence that either Robinson or Marc's speech before the Board of Estimates or their cooperation with federal law enforcement officials interfered with the effective functioning of the DPW. *See Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Indeed, it would be difficult for defendant Balog to offer such a justification, as he was a member of the very Board of Estimates that solicited plaintiffs' statements in order to reach an informed decision on the supplemental appropriations request. In view of the lack of evidence supporting the City's interest in disciplining Robinson and Marc for their speech, we hold that the district court erred in precipitously resolving the *Pickering* balance in favor of the defendants.[2]

**C.**

■ Although we reverse the judgment, we think it appropriate to sound a note of caution. Employment disputes abound across the country; no agency anywhere is altogether free of them. Every public employee's job by definition affects "the public," but every public employee's grievance is not

---

2. Robinson and Marc also allege a sufficient deprivation of an employee benefit. Plaintiffs claim that they were transferred to "shelf positions" within the DPW hierarchy. Robinson was stripped of her supervisory duties in the Engineering Division and transferred to the Collections Division. Whereas she previously had supervised sixty-four employees under an $18 million budget, in her new position she supervises but three employees under a $150,000 budget. Marc maintains that he was also re-

lieved of all supervisory duties and that his city automobile, parking permit, and laptop computer were taken away. He also claims that he was denied an early retirement option that was granted to similarly situated employees. Finally, Robinson and Marc maintain that they have suffered financially by suddenly being excluded from overtime opportunities at an approximate cost of $10,000 and $3,000 per year respectively.

thereby of public concern. *See DiMeglio*, 45 F.3d at 805("[A]lmost anything that occurs within a public agency *could* be of concern to the public . . . .") (quoting *Terrell v. University of Texas Sys. Police*, 792 F.2d 1360, 1362 (5th Cir.1986)). The more sensitive the function of a governmental office, the more likely it is that policy disputes within that office will erupt. Yet public employers retain the right both to set and to execute policy for their agencies without fear of omnipresent *Connick* claims.

This is, however, no ordinary workplace dispute. It is, in fact, a clearer assertion of a constitutional violation than that encountered in any of our precedents. Robinson and Marc allege corruption in the use of public funds and the serious public health hazards to which that misuse of funds might ultimately lead. The controversy boiled over into public discussion before governmental bodies and gained the attention of federal law enforcement authorities. Robinson and Marc were conscripted by these government officials—at both city and federal levels—to tell their story. To approve retaliation against public employees under these circumstances would place wrongdoing in government beyond the point of correction and forsake the curative role of speech in our constitutional regime.

### III.

Robinson and Marc next contend that the district court erred by dismissing the municipal defendant. We hold, however, that the district court properly dismissed the Mayor and City Council of Baltimore.

 Plaintiffs contend that their constitutional injury can be traced to a policy or custom of the municipality in two respects. Robinson and Marc first argue that Balog is a final policymaker of the City with respect to supervision of the DPW. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion) ("[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability."). Although it may be true that Balog was authorized to make personnel decisions related to non-bureau-heads in the

DPW, that power is insufficient to establish final policymaking authority for city employment policy generally. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 965–66 (4th Cir. 1995); *Crowley v. Prince George's County*, 890 F.2d 683, 686–87 (4th Cir.1989). The fact that Balog had the power to choose whom to hire, promote, discharge, and transfer within the department he directed simply cannot establish that he had the broader authority to craft municipal policy. *See Greensboro*, 64 F.3d at 966. As we indicated in our *Greensboro* decision, "[a]ppellants confuse the authority to make final *policy* with the authority to make final implementing *decisions* . . . . The discretion to hire and fire does not necessarily include responsibility for establishing related policy." *Id.* Accordingly, Robinson and Marc's attempt to establish municipal liability on the basis of Balog's alleged policymaking authority must be rejected.

 Robinson and Marc next argue that the City knew of the likely deprivation of their rights yet did nothing to prevent the allegedly unconstitutional conduct. Plaintiffs claim the City became aware of their predicament when Marc testified before the Board of Estimates that "[s]omewhere I think down the road when this thing is all over, we will be eliminated somewhere I guess." Plaintiffs contend that a municipal policy decision caused their injury because the City condoned the defendants' conduct through inaction. *See McWilliams v. Fairfax County Bd. of Supervisors*, 72 F.3d 1191, 1197–98 (4th Cir.1996), *overruled on other grounds by Oncale v. Sundowner Offshore Servs., Inc.*, —— U.S. ——, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

 We disagree. A municipality can be held liable only when its policies were "the 'moving force' behind the injury alleged." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). The Supreme Court has held repeatedly that to satisfy this showing a plaintiff must prove that the relevant municipal action—or, as here, inaction—was taken with deliberate indifference to a plaintiff's

rights. *See, e.g., id.* at 1390; *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs,* 117 S.Ct. at 1391.

Plaintiffs have failed to meet this standard. Their evidence proves only that the Board of Estimates heard some vague and summary allusion to a threat articulated by Marc during his testimony. Marc's statement hardly made the retaliatory conduct allegedly engaged in by individual defendants "obvious" or "so likely to result in the violation of constitutional rights[ ] that the policymakers of the city can reasonably be said to have been deliberately indifferent" to the need for action. *City of Canton,* 489 U.S. at 390, 109 S.Ct. 1197. The Board was never made aware of any past practice in the DPW of disciplining employees on the basis of speech and was not given any particularized information regarding the potential future threat. In fact, the President of the City Council displayed the Board's apparent disbelief that such conduct could occur when he reminded Marc that the City had whistleblower statutes to prevent such retaliatory conduct. In sum, plaintiffs' injury is traceable neither to a municipal policy nor to a municipal policymaker, and we see no basis for imposing liability on the City.

### IV.

For the foregoing reasons, we reverse the district court's judgment granting the individual defendants' motions for summary judgment, affirm the district court's judgment in favor of the Mayor and City Council of Baltimore, and remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*