**Rex KEPHART, Plaintiff,**

v.

**CHEROKEE COUNTY, North Carolina; Rick Honeycutt, in his individual and official capacities as County Manager; Charles Laney, in his individual and official capacities as former County Commissioner; Eugene Morrow, in his individual and official capacities as County Commissioner; and George Postell, in his individual and official capacities as County Commissioner, Defendants.**

No. 2:98CV94.

United States District Court,
W.D. North Carolina,
Bryson City Division.

April 23, 1999.

Paul Lewis Bidwell, Asheville, North Carolina, and Matthew C. Billips, Zimring, Smith & Billips, Atlanta, GA, for plaintiff.

James B. Spears, Jr., Thomas A. Bright, Haynsworth, Baldwin, Johnson & Greaves, Charlotte, NC, for defendants.

## MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Defendants' timely filed objections to the Memorandum and Recommendation of United States Magistrate Judge Max O. Cogburn, Jr. Pursuant to standing orders of designation and 28 U.S.C. § 636, the undersigned referred the Defendants' motion for summary judgment to the Magistrate Judge for a recommendation as to disposition. The Plaintiff has not filed objections to that portion of the Recommendation which would dismiss the claims under the Americans with Disabilities Act (ADA, 42 U.S.C. § 12112) and the claims against the individual Defendants under the Family Medical Leave Act (FMLA, 29 U.S.C. §§ 2612, et. seq.).[1] The Defendants have objected to the Recommendation that claims pursuant to 42 U.S.C. § 1983 and against the County for violations of the FMLA not be dismissed. Having conducted a *de novo* review of that portion of the Recommendation to which the Defendants' have filed objections, the Court respectfully declines to accept the recommendation. 28 U.S.C. § 636(b).

## STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P.

---

1. In the response to Defendants' objections, Plaintiff acknowledges that no objections to the Recommendation that these claims be dismissed were filed but states that these issues are nonetheless preserved for appeal. How-

ever, by failing to file objections to the Magistrate Judge's Recommendation, Plaintiff has waived any right to appeal those issues. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party, here the Plaintiff. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Defendants have an initial burden to show a lack of evidence to support Plaintiff's case. *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the Plaintiff who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* In considering the facts of the case for purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiff, as the nonmoving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Nonetheless, in considering a motion for summary judgment involving a claim of protected speech, as here, "[w]hether speech touches upon a matter of public concern is a question of law for the court." *Urofsky v. Gilmore,* 167 F.3d 191, 195 (4th Cir.1999).

## STATEMENT OF FACTS

In 1989, Plaintiff was appointed Tax Collector for Cherokee County and several months later, he was appointed interim Tax Assessor after the incumbent resigned. Exhibit D *attached to* Plaintiff's Consolidated Response to Defendants' Motion for Summary Judgment (identified therein as Defendants' Exhibit 1). He continued in this mode until 1994 when he was appointed Tax Assessor as well. *Id.* Plaintiff's title at this time became Tax Administrator and he was responsible for both positions. Meanwhile, the County had begun a revaluation project of all County property assessments and in 1993 had hired an outside firm to conduct appraisals. In January 1996, that company, COTT, printed record property cards showing the new assessments. Plaintiff reviewed samplings from the cards to ascertain whether COTT had properly conducted the revaluation. Exhibit A, Deposition of Rex Kephart, *attached to* Plaintiff's Consolidated Response, at 215. Although the Plaintiff did not feel COTT had done a good job, the revaluation was better than the previous one done in 1988. *Id.,* at 218.

In early January 1996, he learned from COTT representatives that members of the Board of Commissioners had asked for the property cards and were reviewing them, often making written notations on the cards. *Id.,* at 224. Plaintiff complained about this practice to the County Manager, Honeycutt, and about thirty minutes later was summoned to the Commissioner's room. *Id.,* at 249.

Well, they called me in and wanted to know, you know, what I was talking about, what I meant, what I was saying, and I tried to explain to them that ... I thought it was wrong. And even if it wasn't legally wrong, it gave the impropriety of being wrong; and that we might end up in litigation with COTT about the contract, because there was a penalty clause in the contract if they didn't have so many parcels finished in the middle of the contract and then a penalty clause at the end and so forth, and there might be litigation. I said, "you know, if we get into litigation and they've got these cards written on and they've got evidence of this, that they're going to use it against you." And that was more or less the extent I recall the conversation.... I determined from the conversation that they were kind of unhappy with me saying that from the expression of their face and the strain in their voice.... And at that time I didn't know that they had actually made notations to raise certain ones and lower

certain ones. I thought they were just writing on the cards, [a] house had been missed, this type thing, [g]o back out and look at it. I thought that's what they were putting on the cards. But then later I learned they was (sic) actually putting down figures and saying, you know, so much an acre and circling sale price and putting an arrow on it indicating that's what it should be and so forth.

*Id.,* at 249–252. During this meeting, Plaintiff and Commissioners Laney, Morrow and Postell were present. *Id.,* at 223, 248, 250, 252, 259, 269–270. Plaintiff thought that although these notations had been made, COTT would go back to the property and review it based on these suggestions. *Id.,* at 254. At this point in time, Plaintiff did not know that the Commissioners had actually changed values for property owned by them or their family members. *Id.,* 254–256.

Not long after this conversation with the Commissioners, Plaintiff talked with Stan Duncan, a state revenue officer, and advised him of concerns that the Commissioners were reviewing the cards. *Id.,* at 262. Duncan is employed by the North Carolina Department of Revenue in the Property Tax Division and is assigned to the western counties of the State. Exhibit B, Deposition of Stan Duncan, *attached to* Plaintiff's Consolidated Response, at 4. He gives advice to counties, including their tax assessors, and works with private appraisal companies. *Id.* During a revaluation process, he frequently checks the quality and progress of the work being provided to counties. *Id.,* at 10. In early January 1996, he received a call from Plaintiff who reported the Commissioners were personally checking the record property cards. *Id.,* at 36. He arranged to meet with the Plaintiff and did so in mid-January. *Id.* Once there, he ran into the project manager for COTT who told him "the Commissioners were back in the Commissioner's room and they were flipping cards or turning cards and giving him corrections." *Id.,*

at 39. "And I advised him specifically that, if he felt confident with the value he had on that property, then he might wish not to make any changes. If he felt they had brought something to consideration that he had not properly considered, he might want to make those changes. I advised him, however, to keep a copy of all those changes." *Id.* And, after that, Mr. Duncan decided to go into the Commissioner's room to see for himself what was going on. *Id.,* at 43. Debbie Coarsey, the County tax appraiser, Board members Charles Laney and George Postell, County Manager Rick Honeycutt and the Plaintiff were present. *Id.*

I simply asked them[—]I could see that they were sitting at the Commissioner's table and they each had some stacks of property record cards. I asked them how the reappraisal was proceeding, and received, again, especially from Miss Coarsey and Mr. Laney, essentially some the same things I've indicated earlier, "that you just wouldn't believe how bad some of these values are" or something to that effect. They explained to me that they were reviewing[—]they felt compelled to review these values. Whereupon I cautioned them, I reminded them, that the assessor and no one else is responsible for those values under the Machinery Act, which is the set of statutes that relate to listing, appraisal and assessment of taxable property. Mr. Laney, I recall asked me directly, he says, "Is there anything in the Machinery Act that specifically prohibits what we're doing?" And I had to admit, that, "No, there was not." ... My final admonition to the County, to Mr. Laney was that the County should take great caution in conducting any acts or series of acts that would cast impropriety towards that Board.... It was my understanding that what they were doing, they were reviewing the values and making notes on the computer-produced cards as to changes they thought appropriate for that parcel. It was also my understanding that those particles (sic)

those cards would be delivered back to COTT and COTT was to make the changes and from that they would send out the notices of value.... I told them, my advice would be not to do it, yes, and that was part of my caution, reminding them that Mr. Kephart's personal (sic) legally responsible and that they shouldn't be doing anything to cast any aspersions on the quality of the work or on the equity of the reappraisal.

*Id.*, at 43–44, 53–54, 56–57. At the time, Mr. Duncan did not feel the Commissioners were engaged in self-dealing. *Id.*, at 63. Although Duncan made a report of his concerns to the main office for the Department of Revenue, nothing more was done. *Id.*, at 67. However, in December 1997 a taxpayer called him with allegations of irregularities by the Board in connection with assessments. *Id.*, at 68. This resulted in a formal investigation by the Department of Revenue which was subsequently turned over to the North Carolina Attorney General.[2] *Id.*, at 77. Thereafter, it was referred to the State Bureau of Investigation. *Id.*

Plaintiff acknowledges that his comments were made only to Honeycutt, Laney, Postell, and Duncan.[3] Plaintiff's Deposition, at 269–271. He did not advise any law enforcement authorities, the local district attorney or the local United States Attorney. *Id.* He made no statements to the press. His comments were limited to

this period in January and were made at a time when he did not know that the Commissioners were actually changing the values of their own property.

Throughout the Plaintiff's tenure, especially during the revaluation project, his office was understaffed and overworked. *Id.*, at 278–79. In fact, he had not enjoyed a smooth relationship with the Board and at one point, he was warned about this by the County Manager. *Id.*, at 279–80. Plaintiff had complained more than once about being overworked and feeling job stress. *Id.*, at 287. Laney had also told him in the past that he should devote more of his time to administrative work as opposed to actually taking the tax collections at the counter and entering the postings thereof. *Id.*, at 288. There was a perception that Plaintiff was too "hands on" and did not properly delegate.

A little over six months after Plaintiff's comments, the Board of Commissioners determined to eliminate the job of Tax Administrator and to reinstate two separate positions of Tax Collector and Tax Assessor. *Id.*, at 294–95. Plaintiff was given the position of Tax Assessor but he did not sustain any reduction in pay or benefits. *Id.*, at 301. Plaintiff had suffered from rheumotoid arthritis for the past 17 years but stated it had been remission. He acknowledges that at this time job stress was aggravating his deteriorating health. *Id.* He does not feel his medi-

**2.** In that report, it was found that certain members of the Board of Commissioners and a County employee had reduced values on property owned by them and/or their family members. Exhibit A *attached to* Plaintiff's Response to Defendants' Objections to the Memorandum and Recommendation of the Magistrate Judge.

**3.** Plaintiff has submitted affidavits from three individuals who were employed by the County during this time. Kenny Sawyer was an assessor for business and personal property and when the job of Tax Administrator was divided, he became the Tax Collector. He averred that at an unspecified time in 1996, Plaintiff told him about the Commissioners' alteration of the cards. Exhibit E, Affidavit of Kenny

Sawyer, *attached to* Plaintiff's Consolidated Response. Julie Nix was an administrative assistant to Honeycutt. She averred that because of her job, she became aware of the alteration of cards and stated that Plaintiff advised her this was improper and illegal. Affidavit of Julie Nix. She also stated that about one week after the Plaintiff's confrontation with Laney, Laney told her that Kephart was a problem but would not be one much longer. *Id.* She inferred from this his anger was due to the confrontation but Laney did not so state. *Id.* Carolyn Howard was a deputy tax collector for the County and averred that at an unspecified time in 1996, the Plaintiff told her the Commissioners were altering the cards. Affidavit of Carolyn Howard.

cal condition prompted the separation of the job of Tax Administrator into two positions. *Id.*, at 310.

On July 10, 1996, his treating physician, Dr. Thomas Rardin, advised he should have a 30–day sick leave. Exhibit 31 *attached to* Plaintiff's Exhibit D. Plaintiff received 30 days of paid sick leave. Plaintiff's Deposition, at 332. On August 19, 1996, Dr. Rardin opined the Plaintiff should remain out of work for another 90 days. Exhibit 32, *attached to* Plaintiff's Exhibit D. Neither of Dr. Rardin's notes reflected a diagnosis or prognosis and merely stated the Plaintiff was under stress.

Plaintiff acknowledges that the tax bills for the County were due to be mailed on September 1, 1996. Plaintiff's Deposition, at 338. In his opinion, however, the County could have put an assistant into the office to supervise the staff in preparing and mailing those bills. *Id.*, at 339. On August 21, 1996, the County denied the Plaintiff's request for a 90–day sick leave, noting that the request lacked a diagnosis, treatment plan and statement of physical restrictions. Exhibit 34, *attached to* Plaintiff's Exhibit D. In addition, it was noted that certain functions of his job, such as mailing the tax bills, required immediate attention. *Id.* As a result, Plaintiff went back to work on August 26, 1996, and in an attempt to avoid stressful situations, he came in early and left in the early afternoon. Plaintiff's Deposition, at 349. Nonetheless, he was careful to work a 40–hour week despite the fact that in the past his job had required up to 65 hours per week. *Id.* On August 27, 1996, Dr. Rardin wrote directly to the County Manager requesting a 90–day sick leave and addressing some of the issues raised by the County. Exhibit 36, *attached to* Plaintiff's Exhibit D. On September 5, 1996, Honeycutt wrote Dr. Rardin, advising that the County would not approve the extended sick leave. Exhibit 37. He noted that the County had reduced Plaintiff's job stress by separating his job and ad-

vised that Plaintiff, who still had not had any physical restrictions placed by the doctor, was known to drive a four wheel recreational vehicle. *Id.* During this time, Plaintiff did not have a direct conversation with Honeycutt or anyone else concerning his need for medical leave. Plaintiff's Deposition, at 356–58. On September 17, 1996, Honeycutt notified Plaintiff that he must be in the office during business hours in order to properly supervise his employees. Exhibit 39, *attached to* Plaintiff's Exhibit D.

Dr. Rardin referred Plaintiff to a psychiatrist, Dr. Byron, who on September 19, 1996, opined the Plaintiff must remain out of work for an indeterminate time. Exhibit 33, *attached to* Plaintiff's Exhibit D. This note, which contained nothing more, was written after the first time Plaintiff saw Dr. Byron. Plaintiff's Deposition, at 336–37. Plaintiff saw Dr. Byron no more than three times. *Id.*

After Plaintiff asserted his rights under the FMLA, the County placed Plaintiff on sick leave on September 24, 1996, and he continued to receive his pay. *Id.*, at 375–76. At that time he was also notified in writing that the County considered his position to be a key employee position. *Id.*, at 383. The notice warned Plaintiff that as a key employee, he might not be restored to his position due to substantial and grievous economic injury to the County. Exhibit 42, *attached to* Plaintiff's Exhibit D. Attached to the notice were copies of regulations promulgated under the FMLA, including the definitions for key employee and substantial and grievous economic injury. *Id.* On December 18, 1996, Plaintiff wrote requesting reinstatement; however, he requested reinstatement to his old position of Tax Administrator which had been abolished. Exhibit 47, *attached to* Plaintiff's Exhibit D. He was notified that the position of Tax Assessor had been filled and the County had no position as Tax Administrator.

## DISCUSSION

### Plaintiff's First Amendment claim.

■ Plaintiff alleges he was terminated in retaliation for his comments to the Board of Commissioners and Stan Duncan.

> The Supreme Court has established definitively that "a state or a division of a state may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." However, plaintiffs asserting retaliatory discharge claims under 42 U.S.C. § 1983 must meet a three-pronged test. The employee must first show that he engaged in speech on a matter of public concern. Second, the claimant must demonstrate that the alleged retaliatory action deprived him of some valuable benefit. Finally, the discharged employee must show a causal relationship between the protected speech and the retaliatory action, such that " 'but for' the protected expression the employer would not have taken the alleged retaliatory action."

*Holland v. Rimmer*, 25 F.3d 1251, 1254 (4th Cir.1994) (quoting *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) and *Huang v. Board of Governors*, 902 F.2d 1134, 1140 (4th Cir. 1990)) (other citations omitted). If the Plaintiff does not pass the first prong of the test, his action fails. *Id.*, at 1255 n. 11. "The final determination whether the speech relates to a matter of public concern is a question of law for the court, . . . and should be made by examining the 'content, form and context of a given statement, as revealed by the record as a whole.' " *Id.*, at 1255 (quoting *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). This inquiry does not include a determination of how interesting or important the subject matter of the speech is and does not turn on where the speech occurs. *Urofsky*, 167 F.3d at 195. "Critical to a determination of whether speech touches upon a matter of public concern is whether the speech is 'made primarily in the [employee's] role as

citizen or primarily in his role as employee.' " *Id.*, at 196. Plaintiff's testimony and that of Mr. Duncan establishes that in mid-January 1996 when he made the comments at issue, no one was under the impression the Commissioners had actually changed property values to reduce their own taxes or those of family members. Plaintiff thought the written notations would be reviewed by COTT who would revisit the properties at issue. Exhibit 24, *attached to* Plaintiff's Exhibit D (Plaintiff's January 17, 1996 memo to COTT asking, "Do you have any idea how long it will take to reenter the data or re-visit the property, when it is required, on all of the errors that the Commissioners find, and get the reval [sic] notices in the mail?"). Plaintiff's expressed concern over marking mistakes on the property cards themselves was that they could be used against the County in the event of litigation with COTT. Although he conceded it would be proper for Commissioners to sample COTT's work product, he felt written notations were not the appropriate method to notify COTT of the problems. Plaintiff's Deposition at 226–27 ("But in my personal opinion looking at the cards there would be nothing wrong because they're going to shortly become public records."). He thought the Commissioners were trying to alert COTT to problems such as assessing a property with a house site when it had none. And, this type of thing had been a problem all along. Exhibit 22, *attached to* Plaintiff's Exhibit D (January 15, 1996 memo to COTT from Plaintiff discussing this issue). Duncan's expressed concern was that Plaintiff was ultimately legally responsible for the valuations but acknowledged to the Board members that their conduct, as he understood it at the time, was not illegal. Plaintiff did not go to any law enforcement authorities because he did not know anything illegal was occurring. In his testimony, he did not state he called Duncan to report the issue but testified he ran into Duncan at the courthouse. Nor did he testify that he spoke to Duncan

about this in order to initiate an investigation; at the time, Plaintiff did not know the Commissioners were reducing their own property values. *Holland*, 25 F.3d at 1255.

Viewing the Plaintiff's speech *at the time made*, as must be done, the Court cannot find he made his comments in order "to bring to light 'actual or potential wrongdoing or breach of public trust' on the part of [County] employees." *Robinson v. Balog*, 160 F.3d 183, 188 (4th Cir. 1998) (quoting *Connick*, 461 U.S. at 148, 103 S.Ct. 1684). Plaintiff's comments addressed matters of private, employment issues, not community concerns. *Id.* (City employees speaking at public hearing concerning allegations of knowing misuse of public funds by city government resulting in environmental hazards constituted protected speech.). And, at the time of his comments, Plaintiff clearly was speaking as an employee, not as a citizen. *Urofsky*, 167 F.3d at 196 ("the Court ha[s] distinguished between speaking as a citizen and as an employee, and ha[s] focused on speech as a citizen as that for which constitutional protection is afforded".). Communications made in the course of carrying out employment duties and between employees speaking as employees are not of public concern. *Holland*, 25 F.3d at 1255–56. The record does not show that at any time, before or since, has Plaintiff in his capacity as a citizen attempted to bring to light wrongdoing.

The form 'and context of the comments also do not support finding them to be protected. Plaintiff's comments were not publically made. They were made in his capacity as the Tax Administrator, not as a citizen attempting to bring to light illegal conduct. The comments were made exclusively to other employees, with the exception of the conversation with Duncan. And, as to Duncan, he was involved with the revaluation process and kept a check on the progress thereof. Plaintiff did not testify, and the evidence does not support a finding, that Duncan as a investigatory

official required Plaintiff to make comments on this issue. *Robinson*, 160 F.3d at 189–90 (Plaintiffs who were "conscripted" by government officials to tell their story engaged in protected speech.).

■ The Court therefore finds the Plaintiff has failed to meet the first prong of the test. Nonetheless, it must be noted that Plaintiff would fail the causation prong as well.

[T]he Supreme Court has allocated the burden of proof regarding causation between the parties in a first amendment discharge case in the following manner. The initial burden lies with the plaintiff, who must show that his protected expression was a "substantial" or "motivating" factor in the employer's decision to terminate him. If the plaintiff successfully makes that showing, the defendant still may avoid liability if he can show, by a preponderance of the evidence, that the decision to terminate the plaintiff would have been made even in the absence of the protected expression, more simply, the protected speech was not the but for cause of the termination.... According to the Court, a[n] "[employee] ought not to be able, by engaging in such [first amendment-protected] conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of that decision."

*Wagner v. Wheeler*, 13 F.3d 86, 90 (4th Cir.1993) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)) (other citations omitted). Assuming *arguendo* that Plaintiff met his initial burden, the evidence shows the County would have made this employment decision in any event. Modifying Plaintiff's position six months after the comments were made produced a less stressful job at the same pay. Indeed, had the change been made in retaliation for Plaintiff's comments, the

Board would have made him Tax Collector instead of Tax Assessor, since in his continued role as assessor he remained capable of being "a thorn in their sides."

Moreover, Plaintiff acknowledges his condition of rheumatoid arthritis had been in remission for the past 17 years. Yet, within two days of being told of the job change, he took a 30–day medical leave during which he received his full pay. Despite the fact that his doctor had placed no physical restrictions on him, Plaintiff then requested a 90–day extension. This was denied because his doctor failed to provide adequate documentation of its necessity and due to the impending deadline for mailing tax bills. And, when Plaintiff returned to work, it was not unreasonable for his employer to require his presence during business hours since he was in a supervisory capacity. Nonetheless, at a time when the tax bills still had not been completed, Plaintiff insisted on his right under FMLA to have a 90–day sick leave. The Court finds the Defendant showed by a preponderance of the evidence that its decision to replace the Plaintiff in order to keep the tax office viably in operation was not motivated by his comments made nine months earlier. There is no evidence, beyond speculation, that but for his comments he would not have been replaced.[4]

**Plaintiff's claim under the FMLA.**

■ The FMLA entitles eligible employees to take up to twelve weeks of unpaid leave in any twelve month period for specified medical reasons. *Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294, 300 (4th Cir.1998). It also provides that upon return from such leave, an employee is entitled to be restored to his position, or an equivalent one, unless denial is necessary to prevent substantial and grievous economic injury to the employer's operations.[5] 29 U.S.C. § 2614(b)(1). However, restoration may not be denied unless the employee is a so-called "key employee," a salaried employee among the highest paid ten percent of the employees paid by the employer. 29 U.S.C. § 2614(b)(2). In the Defendants' motion for summary judgment, it was alleged that Plaintiff's position as a key employee was undisputed. Plaintiff responded that Defendants had failed to produce evidence of his salary and other indicia necessary to meet that standard. However, Plaintiff did not deny such status. Because neither party has pointed to any portion of the record in support of or in opposition to this particular fact, the Court will require the parties to address this issue before this aspect of the Defendants' objections are considered.[6]

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' motion for summary judgment as to Plaintiff's claim pursuant to 42 U.S.C. § 1983 is **GRANTED,** and the same is hereby **DISMISSED;** and

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment as to Plaintiff's claim under the Americans with Disabilities Act is **GRANTED,** and the same is hereby **DISMISSED;** and

**IT IS FURTHER ORDERED** that the Court will defer ruling on the Defendants' motion for summary judgment on the Plaintiff's claim pursuant to FMLA and the parties shall submit any additional evidence on or before May 7, 1999; and

**IT IS FURTHER ORDERED** that the pretrial conference presently scheduled for

---

4. The Court acknowledges the affidavits filed by Sawyer, Nix and Hodges but finds them speculative.

5. The regulations enacted with the statute provide that if reinstatement of a key employee threatens the economic viability of the employer, this would constitute such injury. A lesser injury which causes long-term and substantial economic injury also suffices. 29 C.F.R. § 825.218(c).

6. Exhibit 42 attached to Plaintiff's Exhibit D contains the notice provided to the Plaintiff that the Defendant County considered him to be a key employee. That is not sufficient.

April 27, 1999, is cancelled and will be rescheduled after the Court's ruling.