**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-2503

SEAN P. SMITH,

　　　　　　　Plaintiff - Appellant,

　　　v.

PETER S. GILCHRIST, III,

　　　　　　　Defendant - Appellee.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:10-cv-00636-RJC-DLH)

Argued: March 18, 2014 　　　　　　　Decided: May 14, 2014

Before TRAXLER, Chief Judge, DUNCAN, Circuit Judge, and DAVIS, Senior Circuit Judge.

Reversed and remanded by published opinion. Chief Judge Traxler wrote the opinion, in which Judge Duncan and Senior Judge Davis joined.

**ARGUED**: Matthew Robert Arnold, James Bradley Smith, ARNOLD & SMITH, PLLC, Charlotte, North Carolina, for Appellant. Grady L. Balentine, Jr., NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF**: Roy Cooper, Attorney General, Kathryn H. Shields, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

TRAXLER, Chief Judge:

Sean P. Smith appeals a district court order granting summary judgment against him in his § 1983 action alleging that he was fired for exercising his free-speech rights in violation of the United States and North Carolina Constitutions. Concluding that the district court erred in granting summary judgment, we reverse and remand for trial.

I.

Smith was employed as an assistant district attorney ("ADA") for the Mecklenburg County, North Carolina, District Attorney's office (the "DA's office") from 2004 through July 2010. In his last several years with the DA's office, he worked on the crimes-against-persons team. Peter Gilchrist was the elected district attorney ("DA") during Smith's tenure.

In February 2010, Smith met with Gilchrist to notify him of his intention to declare his candidacy for the office of Mecklenburg County district court judge. Gilchrist initially told Smith that to run for the office he would need either to resign from his position as ADA or take an unpaid leave of absence until the November election. However, Smith later brought to Gilchrist's attention the existence of North Carolina General Statute § 126-13(b), which Smith interpreted as entitling him to run without resigning from his position as an ADA. As a result, Gilchrist reconsidered and informed Smith

2

that he could run for judge without resigning or taking a leave of absence.  Smith subsequently formalized his candidacy.

A few months later, on his own time and at his own expense, Smith attended a four-hour defensive-driving course in Charlotte that the nonprofit Safety and Health Council of North Carolina ("SHC") offered to ticketed drivers.[1]  According to Smith, ticketed drivers would receive a pamphlet about the course from the ticketing police officer.  Drivers who took the course were required to pay court costs and pay $60 to the driving school, but they received a "prayer for judgment continued" ("PJC") and were not assessed a fine.[2]  This program substantially reduced the number of cases that the DA's office and the courts were required to handle, freeing up resources that could be used for other matters.

---

[1] SHC is a 501(c)(3) entity independent from the DA's office.  See 26 U.S.C. § 501(c)(3).

[2] "Under North Carolina law, 'prayer for judgment continued' is one of several ways in which a court may direct that judgment be handled following a conviction by verdict or guilty plea." Evans v. UDR, Inc., 644 F. Supp. 2d 675, 687 n.3 (E.D.N.C. 2009).  "The term refers specifically to deferral of court action on the state's request for entry of judgment, the final order in a case which would include the sentence being imposed on the defendant." Id.  A PJC for a moving traffic violation will not result in an increase in a driver's insurance premium unless the driver or someone in his household has received a PJC for a moving traffic violation in the prior three years.  See N.C.G.S. § 58-36-75(f).  A PJC will also not result in points on the driver's driving record so long as the driver has not received two other PJCs during the preceding five years.  See N.C.G.S. § 20-4.01(4a)(a)(4).

3

On Friday, July 9, 2010, Smith gave an on-camera interview to the Charlotte FOX television affiliate detailing concerns he had about the defensive-driving course. Smith gave the interview as a part of his judicial campaign, and it was not related to his responsibilities as an ADA in the crimes-against-persons team, which did not include anything "related to traffic court." J.A. 131. The following Wednesday, Gilchrist, having been contacted by the interviewer for a reaction to the criticism by one of his ADAs regarding the course, called Smith to ask if he had given the interview. When Smith said he had, Gilchrist asked him to come to his office immediately. Smith then met with Gilchrist and Deputy DA Bart Menser in Gilchrist's office, whereupon the three engaged in a brief conversation.

Gilchrist had not seen the interview. Rather, Smith's description of the interview during this meeting was the sole basis for Gilchrist's knowledge of what Smith had said. Smith told Gilchrist that he gave the interview as part of his campaign for judge, and according to Gilchrist, Smith voiced three concerns: first, that the students of the course were not paying attention; second, that law enforcement officers were giving legal advice to ticketed drivers regarding whether they should take the course; and third, that some drivers who decided to take the course and receive PJCs were harming themselves by losing the option to obtain a PJC for a future citation.

4

Gilchrist testified that none of these concerns "had to do with Mecklenburg County District Attorney policy." J.A. 126; see also J.A. 128 (Gilchrist's testimony that Smith in the interview "did not criticize any of [Gilchrist's] policies.").

In addition to discussing what Smith had said during the interview, Smith, Gilchrist, and Menser also discussed Smith's views generally regarding the defensive-driving program. According to Menser, Smith explained to Gilchrist and Menser that Smith "had issues with the driving school and with the fact that the District Attorney's Office was involved in recommending that people go to the driving school." J.A. 148. Menser testified that Smith told Gilchrist and Menser that Smith "didn't think the driving school was a good idea." J.A. 148.

At the end of the conversation, Menser asked Smith if there were any other policies of the DA's office with which he disagreed.[3] Gilchrist testified that Smith said that there were, but when Smith was asked to identify the specific policies, Smith said, "I decline to answer." J.A. 60 (internal quotation marks omitted). The following day, Gilchrist terminated Smith's employment. He did not provide Smith with any reason for the termination. He testified, however, that Smith's refusal to identify the DA's office policies with which he disagreed was

_____

[3] Gilchrist testified that Smith was not "involved in formulating any . . . office policies." J.A. 77.

5

the sole reason he was terminated. Gilchrist testified that he considered that refusal to be "insubordinate." J.A. 60.

Smith subsequently brought an action in federal district court seeking money damages against Gilchrist in his individual capacity. See 42 U.S.C. § 1983. Smith alleged that the statements he made during the television interview were a substantial motivation for Gilchrist's decision to fire him and that the firing violated his free-speech rights under the United States and North Carolina constitutions. In his answer to the complaint, as is relevant here, Gilchrist denied firing Smith for making the statements during the interview, and he asserted public-official and qualified immunity.

Following discovery, Gilchrist moved for summary judgment, arguing only that Smith had failed to forecast evidence creating a genuine issue regarding whether the interview was a substantial motivation for Gilchrist's decision to fire Smith. After Smith filed a response challenging the asserted lack of evidence, and Gilchrist filed a reply, the district court sua sponte requested that the parties brief an issue not previously argued by Gilchrist – whether qualified immunity provided an absolute defense to Smith's claims.[4] In response to the district

---

[4] We recognize that Gilchrist did not argue he was entitled to qualified immunity in his motion for summary judgment and (Continued)

6

court's direction, Gilchrist again focused on the asserted lack of evidence that Smith's public statements were a substantial motivation for his firing. Gilchrist agreed that "[i]t is uncontested that [Smith] was speaking as a citizen on a matter of public concern, and there are no relevant facts to challenge finding that [Smith's] interest in speaking outweighed the government's interest in providing effective and efficient services to the public." J.A. 296. Nevertheless, Gilchrist presented the argument that even assuming Smith had created a jury issue regarding causation, Gilchrist was entitled to qualified immunity based on the subtlety of the test for determining whether an employee's interest in speaking as a private citizen on a matter of public concern is outweighed by the employer's interest in efficiency. See DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir. 1995) ("[O]nly infrequently will it be clearly established that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a particularized balancing that is subtle, difficult to apply, and not yet well-defined." (internal quotation marks omitted)). Gilchrist contended that because Smith's "interview criticized the policies of the office for

_____

that he advanced it only in response to the direction by the district court.

7

which he worked," a reasonable official in the DA's position might have believed he was constitutionally justified in firing Smith for making the statements. J.A. 299. In Smith's supplemental brief, as is relevant here, Smith noted that Gilchrist had conceded that the statements were protected, and Smith repeated his view that there was a genuine factual issue regarding Gilchrist's motivation for firing him.

The district court then granted summary judgment to Gilchrist. See Smith v. Gilchrist, No. 3:10-cv-636-RJC-DLH, 2012 WL 5985487 (W.D.N.C. Nov. 28, 2012). In so doing, the court assumed that Smith had created a jury issue regarding whether his constitutional rights had been violated, but concluded that Gilchrist was entitled to qualified immunity because a reasonable official in Gilchrist's position could have believed that the interest of the DA's office as employer in suppressing Smith's speech outweighed Smith's interest in speaking as a citizen on a matter of public concern. See id. at *9-11. The court concluded that the same reasons entitled Gilchrist to public-official immunity on the state-law claim. See id. at *12.

## II.

Smith first argues that the district court erred in granting summary judgment against him on his First Amendment claim. We agree.

8

"We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." T-Mobile Ne. LLC v. City Council of Newport News, 674 F.3d 380, 384-85 (4th Cir. 2012) (internal quotation marks omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Stanton v. Sims, 134 S. Ct. 3, 4 (2013) (per curiam) (internal quotation marks omitted). Thus, "in gray areas, where the law is unsettled or murky, qualified immunity affords protection to a government official who takes an action that is not clearly forbidden—even if the action is later deemed wrongful." Occupy Columbia v. Haley, 738 F.3d 107, 118 (4th Cir. 2013) (alteration and internal quotation marks omitted). "We do not require a case directly on point" in order to conclude that the law was clearly established, "but existing precedent must have placed the statutory or constitutional

question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011).

To survive a claim of qualified immunity, a plaintiff must satisfy the following two-prong test: "(1) the allegations underlying the claim, if true, substantiate [a] violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have known." Ridpath v. Board of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006) (internal quotation marks omitted). The Supreme Court has observed that the outcome of the "clearly established" test "depends largely upon the level of generality at which the relevant legal rule is to be identified." Wilson v. Layne, 526 U.S. 603, 614 (1999) (internal quotation marks omitted). For that reason, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." Id. at 615.

Here, Smith has alleged a violation of his First Amendment rights to free speech. The First Amendment to the United States Constitution, in relevant part, provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment makes this prohibition applicable to the states. See Fisher v. King, 232 F.3d 391, 396 (4th Cir. 2000). Not only does the First Amendment protect

10

freedom of speech, it also protects "the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). "Protection of the public interest in having debate on matters of public importance is at the heart of the First Amendment." McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998). At the same time, the government, as an employer, "is entitled to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies. And for this purpose, the government has an interest in regulating the speech of its employees." Id. (citation omitted).

The Supreme Court in Connick v. Myers, 461 U.S. 138 (1983), and Pickering v. Board of Education, 391 U.S. 563 (1968), has explained how the rights of public employees to speak as private citizens must be balanced against the interest of the government in ensuring its effective and efficient operation. In light of these competing interests, we have held that in order for an adverse employment action to violate a public employee's First Amendment rights to freedom of speech, it must be the case (1) that the employee "was speaking as a citizen upon a matter of public concern" rather than "as an employee about a matter of personal interest"; (2) that his "interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public"; and

11

(3) that his "speech was a substantial factor" in the employer's decision to take action against him.  McVey, 157 F.3d at 277–78.

This appeal concerns the second prong of the McVey test – "whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public."  Id. at 277. That Smith was speaking on matters of public concern during the interview is clear and is not challenged by Gilchrist.  See Urofsky v. Gilmore, 216 F.3d 401, 406-07 (4th Cir. 2000) (en banc) ("Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community.").  That ticketed drivers are not paying attention in their defensive driving class is of obvious interest to the community, see Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 353 (4th Cir. 2000) (explaining that statements "relating to public safety are quintessential matters of 'public concern'"), as are the facts that police officers are improperly providing legal advice, see Robinson v. Balog, 160 F.3d 183, 188 (4th Cir. 1998) (holding that speech exposing "actual or potential wrongdoing" is speech on a matter of public concern (internal quotation marks omitted)), and that some ticketed drivers are unwittingly making decisions that are contrary to their legal interests.  Accordingly, Smith could not be fired

12

for making the statements he made unless his right to speak was outweighed by his employer's legitimate interests.

Regarding this balancing, the government bears the "burden of justifying the discharge on legitimate grounds." Rankin v. McPherson, 483 U.S. 378, 388 (1987). The balancing test requires us to consider the context in which the speech was made, including the employee's role and the extent to which the speech impairs the efficiency of the workplace. See id. at 388–91.

> Factors relevant to this inquiry include whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the [agency]; (6) undermined the mission of the [agency]; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the [agency]; and (9) abused the authority and public accountability that the employee's role entailed.

Ridpath, 447 F.3d at 317. In balancing the competing interests, "we do not require the public employer to prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was 'reasonably to be apprehended.'" Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992) (quoting Jurgensen v. Fairfax Cnty., 745 F.2d 868, 879 (4th Cir. 1984)). Whether the employee's interest in speaking outweighs

the government's interest is a question of law for the court. See Joyner v. Lancaster, 815 F.2d 20, 23 (4th Cir. 1987).

Gilchrist conceded in the district court – with good reason – that Smith had forecasted evidence sufficient to establish that his interest in speaking outweighed the government's. See J.A. 296 ("[T]here are no relevant facts to challenge finding that [Smith's] interest in speaking outweighed the government's interest in providing effective and efficient services to the public."). Gilchrist, after all, had agreed in his deposition that none of the concerns Smith expressed in the interview "had to do with Mecklenburg County District Attorney Office policy"[5] or in any way impugned the authority or credibility of the DA's office, and Gilchrist had testified that he did not consider the decision to give the interview to be disloyal to the DA's office.[6] J.A. 126. Indeed, there is no evidence that the

---

[5] This factual concession is particularly noteworthy given that Gilchrist's assertion that the "interview criticized the policies of the office for which [Smith] worked" was the sole basis Gilchrist gave in response to the district court for his contention that a reasonable official might not have known that Smith's speech was constitutionally protected. J.A. 299. In this court, Gilchrist has subtly changed his argument, contending that the uncertainty regarding whether the speech was protected was due to the fact that the "interview criticized a program which directly impacted the office for which [Smith] worked." Appellee's Brief at 21.

[6] Certain public employees' positions' functions are such "that party affiliation or political allegiance is an appropriate requirement for the effective performance of the (Continued)

14

concerns expressed during the interview even pertained to circumstances within Gilchrist's control.  The concerns related to the goings-on in the SHC's defensive-driving classroom, improper legal advice by police officers, and ticketed drivers making decisions that were not in their legal best interests.[7]

---

public office involved." Bland v. Roberts, 730 F.3d 368, 375 (4th Cir. 2013) (alteration and internal quotation marks omitted).  Such employees may be terminated for speech constituting political disloyalty to their employers. See id. at 374-75 & n.5.  Gilchrist does not argue that Smith's position fit into this exception or that there was any gray area on the point that would entitle him to qualified immunity for firing Smith.

[7] Menser specifically testified that Smith never expressed "any concern about the fact that the [DA's] Office was referring people to the driving school."  J.A. 169.  In concluding that Gilchrist was entitled to qualified immunity, the district court noted testimony from Menser that Smith "stated that 'he had issues with the driving school and with the fact that the District Attorney's Office was involved in recommending that people go to the driving school," that Smith "'disagreed with the D.A.'s office policy to be part of the arrangement that allowed individuals to go to the driving school and receive a PJC,'" and that Smith "'objected to the school, and . . . to [the District Attorney's Office's] involvement in [it].'" Smith, 2012 WL 5985487, at *10 (second and third alterations in original).  But the testimony the district court identified concerned opinions that Smith had expressed in his July 14 meeting with Gilchrist and Menser, not statements that he actually made during the television interview. See, e.g., J.A. 148 (Menser's testimony that Smith "did tell us . . . that he didn't think the driving school was a good idea" (emphasis added)); J.A. 181 (Menser's testimony that he "understood [Smith] to be telling us that he disagreed with the D.A.'s office policy to be part of the arrangement that allowed individuals to go to the driving school and receive a PJC" and that Smith "objected to the school, and . . . to [the DA office's] involvement in [it]" (emphasis added)). Whether Smith (Continued)

15

And, there was no evidence that Smith sought to place any blame on Gilchrist during the interview for any of these actions. There simply was no evidence that Smith's public statements would cause problems with harmony or discipline in the DA's office such that the efficiency of the office would be expected to be adversely affected.

Nor was there any evidence that Gilchrist had any reason to believe that Smith's interview would negatively affect the efficiency or effectiveness of the DA's office. Gilchrist testified that he felt, since the defensive driving program was responsible for such a significant reduction of the DA's office's caseload, that "any criticism of the [SHC] necessarily impacted [the DA's] office." J.A. 100. But Gilchrist offered no explanation of, or support for, his belief. This attempt to connect what Smith said to the DA's office is such a stretch as to be entitled to no weight at all and leads us to agree with Gilchrist's initial assessment that no relevant facts exist from the DA's point of view to challenge Smith's right to speak.

---

privately disagreed with the DA's office policy concerning the driving course is irrelevant to the issue of whether Gilchrist could fire Smith for public statements that did not question policies of the DA's office.

16

It is true, of course, that Gilchrist believed that two of the concerns Smith raised in the interview were invalid.[8] Nevertheless, it has been long established that such differences of opinion cannot justify terminating the speaker, as <u>Pickering</u> itself made clear.

In <u>Pickering</u>, a teacher was fired for a letter he sent to the local newspaper that was critical of the way in which the school board had handled past bond proposals and had allocated financial resources between the schools' educational and athletic programs. <u>See</u> <u>Pickering</u>, 391 U.S. at 566. The letter was also critical of the superintendent's alleged attempts to prevent teachers from opposing or criticizing the proposed bond issue. <u>See</u> <u>id.</u> The Court explained that the possibility that the letter would foment controversy and conflict did not justify the teacher's firing because there was no evidence that the letter had that effect. <u>See</u> <u>id.</u> at 570. The Court also held that the letter could not be found to be somehow "<u>per se</u> harmful to the operation of the schools" because the criticism that too

_____

[8] In his deposition, Gilchrist did not dispute that students were not paying attention during the driving course or that police officers were giving legal advice to ticketed drivers. He nevertheless opined that these concerns were invalid because it is commonplace that students in many settings do not pay attention in class and police officers' giving legal advice is simply "a reality." J.A. 75. Gilchrist agreed that "there may be substance to" Smith's concern that some drivers were not acting in their legal best interests by deciding to take the PJC for the ticketed offenses. J.A. 130.

17

much money was being allocated to athletics merely "reflect[ed] . . . a difference of opinion between [the teacher] and the Board as to the preferable manner of operating the school system, a difference of opinion that clearly concerns an issue of general public interest." Id. at 571. The Court noted

> On such a question free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

Id. at 571-72.

Similarly, in this case, the simple fact that Gilchrist may have disagreed with Smith's vision of how SHC should be running its defensive driving course or whether police officers should be giving legal advice to ticketed drivers is clearly not the sort of consideration that could be weighed against Smith's interest in speaking as a citizen on matters of public concern. See id. at 571 ("[T]he only way in which the Board could conclude, absent any evidence of the actual effect of the letter, that the statements contained therein were per se detrimental to the interest of the schools was to equate the Board members' own interests with that of the schools."); see also Ridpath, 447 F.3d at 321 (holding employer was not entitled to qualified immunity for terminating employee "for making

18

protected statements that [employer] did not like"). Calling attention to a significant weakness in a course designed to protect the public safety, alerting the public to improper legal advice, and attempting to protect citizens from unwittingly making legal decisions that are not in their best interests are critical services that a DA's office has no legitimate interest in opposing. See Garcetti v. Ceballos, 547 U.S. 410, 419 (2006) ("The [Supreme] Court has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion."); Pickering, 391 U.S. at 572 (noting that "[t]eachers are . . . the members of a community most likely to have informed and definite opinions" concerning spending by schools).

In sum, Gilchrist certainly was correct to concede that there were no relevant facts upon which he could base an argument that Smith's interest in speaking as a private citizen on matters of public concern was outweighed by the government's interest in providing effective and efficient services to the public. Thus, Smith satisfied the first qualified-immunity prong by forecasting evidence sufficient to "substantiate [a] violation of [his First Amendment] right" to freedom of speech. Ridpath, 447 F.3d at 306 (internal quotation marks omitted).

Gilchrist argues to us, however, as he did to the district court, that even assuming that Smith's interests actually (and

19

completely) outweighed the government's, he is nonetheless entitled to qualified immunity because <u>it would not have been clear to a reasonable official in Gilchrist's position</u> that Smith's interests outweighed the government's. See id. (explaining that to survive a qualified-immunity claim, a plaintiff must demonstrate the "violation . . . of a clearly established right of which a reasonable person would have known" (internal quotation marks omitted)). In this regard, Gilchrist emphasizes that balancing the government's interests against the employee's is a subtle process. He also maintains that because of the significant role that the defensive-driving course played in reducing the DA's office caseload and freeing resources for other matters, a reasonable DA in his position could have believed that any public criticism of that course undermined the operation and mission of the DA's office. Gilchrist contends that, under this theory, a reasonable DA might have believed he was justified in firing Smith for publicly making the statements in question.

This argument need not detain us long. For purposes of determining whether Smith's right to speak without recrimination was clearly established, we conclude that the right at issue, described at the appropriate level of specificity, is as follows: it is the right of an ADA running for public office not to be fired for speaking publicly in his capacity as a

20

candidate on matters of public concern when the speech is critical of a program that substantially reduces the DA's office's caseload but there is no reason to believe the speech will negatively impact the DA's office's efficiency.

Any reasonable official in Gilchrist's position would have been aware of that right on the day of Smith's termination.[9] The notion that programs that reduce a government agency's workload are somehow off limits from criticism by government employees even when there is no reason to expect that the criticism will actually hamper the government office's efficiency finds no basis whatsoever in the law. At the time of Smith's firing, it was well established that a government employee's speech made as a private citizen on a matter of public concern is balanced against the adverse effect that the government reasonably anticipates the speech will have on its ability to operate efficiently. See Maciariello, 973 F.2d at 300. In this case, there was no evidence forecasted in the summary judgment record that Smith's speech was expected to have any particular effect,

---

[9] We emphasize that Gilchrist denies that he terminated Smith because of what he said during the interview, and he has never taken the position that he had the right to do so. In fact, he acknowledged in his deposition that firing Smith for his speech would have violated his constitutional rights. We consider this acknowledgment in the context of determining the legal issue before us. We offer no view today as to the merits of Gilchrist's contention that he did not fire Smith for his speech, which remains an issue for trial.

as Gilchrist's concession in the district court reflected. Thus, although Gilchrist is certainly correct that the process of balancing the employer's interests against the employee's is a subtle one, the general complexity of the balancing test is of no consequence in this case since there is nothing on the employer's side of the ledger to weigh. See Pickering, 391 U.S. at 572-73 (holding that in a case "in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally," the government failed to show that its interests outweighed the teacher's interest in speaking); cf. Goldstein, 218 F.3d at 356 (holding that "generalized and unsubstantiated interests" "in maintaining morale and efficiency within" the fire department did not outweigh plaintiff's speech interest); Daulton v. Affeldt, 678 F.2d 487, 491 (4th Cir. 1982) (concluding that speech did not interfere with the operation of a college where the "disputes did not . . . create any more disharmony than would be expected when a subordinate criticizes her superiors on any subject").

In sum, a reasonable DA in Gilchrist's position would have known that he could not fire an ADA running for public office

22

for speaking publicly in his capacity as a candidate on matters of public concern when the speech is critical of a program that substantially reduces the DA's office's caseload but there is no reason to believe the speech will negatively impact the DA's office's efficiency. We therefore hold that the district court erred in granting summary judgment to Gilchrist on the First Amendment claim on the basis of qualified immunity.

## III.

Smith next argues that the district court also erred in granting summary judgment against him on his North Carolina constitutional claim. As we have mentioned, the district court granted summary judgment on the North Carolina claim for the same reason that it granted summary judgment on the federal claim. See Smith, 2012 WL 5985487, at *12. Gilchrist understandably does not argue that a separate ground exists for affirming with regard to the state-law claim if summary judgment was improperly granted on the federal claim. See Bailey v. Kennedy, 349 F.3d 731, 742 n.6 (4th Cir. 2003) (holding that when officers violated rights that were clearly established, officers were not entitled to public officers' immunity from North Carolina state-law claims). We therefore reverse the summary judgment on the state-law claim as well.

IV.

For the foregoing reasons, we reverse the district court order granting summary judgment against Smith and remand to the district court for trial.

REVERSED AND REMANDED