**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 14-1910**

---

RANDALL E. BRICKEY,

       Plaintiff - Appellee,

    v.

ROBB HALL,

       Defendant – Appellant,

    and

DICKIE DYE; T. MICHAEL TAYLOR; ERIK C. PUCKETT; NEIL JOHNSON; C. TODD YOUNG; TOM HOLLY; VINCENT MAIDEN,

       Defendants.

---

Appeal from the United States District Court for the Western District of Virginia, at Abingdon. Glen E. Conrad, Chief District Judge. (1:13-cv-00073-GEC-PMS)

---

Argued: December 10, 2015           Decided: July 8, 2016

---

Before DUNCAN, KEENAN, and DIAZ, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Diaz wrote the opinion, in which Judge Duncan and Judge Keenan joined.

---

**ARGUED**: Jeremy E. Carroll, GLENN, FELDMANN, DARBY & GOODLATTE, Roanoke, Virginia, for Appellant. Edward Kyle McNew, MICHIEHAMLETT PLLC, Charlottesville, Virginia, for Appellee. **ON BRIEF**: Andrea Kay Hopkins, GLENN, FELDMANN, DARBY & GOODLATTE,

Roanoke, Virginia, for Appellant.  Hilary K. Johnson, Abingdon, Virginia, for Appellee.

_____

DIAZ, Circuit Judge:

Police officer Randall Brickey was fired for comments he made as a candidate for town council that were critical of his employer, the Saltville Police Department, and its Police Chief, Rob Hall. Brickey filed suit under 42 U.S.C. § 1983 for retaliatory discharge in violation of the First Amendment. The district court denied Hall qualified immunity, and this interlocutory appeal followed. Because it was debatable at the time of Brickey's dismissal that his speech interests as a citizen outweighed Hall's interests as a public employer, we conclude that Hall is entitled to qualified immunity. We therefore reverse.

## I.

### A.

Brickey was an officer with the Saltville Police Department from December 1, 2006, to May 21, 2012, the day his employment was terminated. Hall became Police Chief in July 2011, taking over a department struggling with well-publicized problems of financial mismanagement, officer misconduct, and a general lack of professionalism. In an effort to improve the department's operations and public image, Hall instituted several policy changes, including increased foot patrols, a stricter dress code, and new payroll procedures.

3

In early 2012, Brickey decided to run for Saltville Town Council. He discussed the plan with Hall, who indicated that the campaign would not cause employment problems so long as Brickey did not campaign in uniform or disparage the department in contravention of departmental policy.

During the campaign, two local newspapers posed questions to the candidates, inviting them to submit responses for publication. One paper provided this prompt: "Motivation for seeking office/why should the voters choose you?" J.A. 337. After identifying himself as a member of the Saltville Police Department with twenty-three years of experience as a police officer, Brickey responded in relevant part as follows:

> I teach the D.A.R.E. [i.e., Drug Abuse Resistance Education] Program at Saltville Elementary School. . . . I went in to talk to Chief (Rob) Hall about ordering the supplies for the D.A.R.E. graduation. I was told there was no money to place the order. After checking with the accounts payable clerk to see where the $500 in the police department budget had been spent, I was shown several invoices that were charged to the D.A.R.E. account. The items on the invoices had nothing to do with the D.A.R.E. program. I also found, from looking at a copy of the budget that I obtained from the town, that the town receives $225,000 in highway maintenance funds from the state. Only $3,000 is approved in the budget for paving. Seeing this, along with the other misuse of taxpayers' money, shows me that we have a very poor management at the council level and there needs to be a change.

Id.

4

Next, in response to a question about the town's "greatest needs," Brickey noted road paving, improved management of the town pool, and the following changes to the Saltville Police Department: "The town police department needs to be more professional. Officers need to do more foot patrols during the day shift and become more familiar with business owners. The police department needs to be more [aggressive] on investigations and focus more on drug trafficking." Id.

Finally, Brickey responded to a question as to how to meet those needs. He first noted that he had "been told by some business owners in town during [his] campaign for town council that they would like to see more foot patrols from the police department, and would like to see the chief during daytime hours." Id. He went on to propose the addition of a full-time investigator, stating that the town had a serious drug problem and that he knew of "cases that need to be investigated by the police department." Id. Brickey's statements were printed in late April 2012.

About a week later, Hall informed Brickey that he believed Brickey's statements violated departmental policy. The alleged violations of the Police Department Policy Manual included (1) a failure to "display respect for [his] superior officers, subordinates, and associates"; (2) "speak[ing] rumors detrimental to the department or another employee"; (3) "us[ing]

5

or attempt[ing] to use [his] official position, badge or credentials for personal or financial gain or advantage"; (4) "communicat[ing] . . . information concerning operations, activities or matters of police business, the release of which . . . may have an adverse impact on the department image, operations, or administration"; and (5) "criticiz[ing] or ridicul[ing] the Department, its policies, or other employees by speech . . . [that] undermines the effectiveness of the Department, interferes with the maintenance of discipline, or is made with reckless disregard for truth or falsity." J.A. 352-55, 357-70.

Hall hired Gary Reynolds—an out-of-state, former police chief—to investigate the allegations and to determine whether Brickey in fact violated departmental policies. Reynolds interviewed Hall, Brickey, Assistant Chief Erik Puckett, the Saltville town auditor, and the other five officers in the police department. In speaking with Reynolds, Brickey withdrew or attempted to clarify some of his statements. Asked about his comments on the professionalism of the department, Brickey said, "It's not that I meant they are unprofessional, we just need to be on patrol more." J.A. 373. Regarding the D.A.R.E. comments, Brickey admitted that the $500 was in fact accounted for in a different line item of the budget. J.A. 384. He also conceded that he "should have said mismanagement of funds versus misuse

6

of funds." J.A. 387. Brickey insisted that his "statements regarding the DARE account were not about Chief Hall, they were about the [town] council members." J.A. 383.

According to Reynolds's investigation, Brickey's statements caused concern within the Saltville government and police department. A town auditor interpreted Brickey's statements as alleging that Chief Hall was misusing funds. J.A. 381. This "upset" the auditor, who, after looking into the matter, "found no misuse of taxpayer money by Chief Hall." Id. Some police officers believed that the comments reflected poorly on the department, though at least two officers told Reynolds that they had not read Brickey's comments. J.A. 381-83, 386.

In Reynolds's final estimation, Brickey's statements to the newspapers violated departmental policies. J.A. 387. According to Reynolds, Brickey's statements regarding the "misuse" of D.A.R.E. funds "clearly 'bad mouthed' the Police Department and especially the Police Chief, and thus were harmful to the public trust of Chief Hall as well as his integrity." Id. Moreover, Reynolds faulted Brickey for failing to investigate properly or verify his allegations that police funds were being misused. J.A. 388. Specifically, Reynolds found that Brickey overlooked the fact that the D.A.R.E. budget line item also included funds for "Community Relations," and that the invoices Brickey observed were for legitimate community-relations expenses. Id.

7

After notifying Brickey of the results of the investigation, Hall held a meeting with Brickey, Reynolds, and Puckett in which Brickey was given an opportunity to respond to the allegations and the findings of the report. On May 21, 2012, Hall terminated Brickey's employment. Brickey pursued the department's grievance procedures to no avail.

B.

Brickey filed suit under § 1983, naming as defendants Hall and a number of other individuals who played a role in his dismissal. In addition to his First Amendment retaliatory-discharge claim, Brickey also asserted procedural and substantive due-process claims. The due-process claims were dismissed on a 12(b)(6) motion, as was a request for punitive damages. The retaliatory-discharge claim survived, and the defendants later moved for summary judgment, attacking the claim on the merits and also asserting qualified immunity. The district court granted the motion in part and denied it in part. Brickey v. Hall, No. 1:13-CV-00073, 2014 WL 4351602, at *9 (W.D. Va. Sept. 2, 2014). Summary judgment was granted as to all defendants except Chief Hall—none of the other officials, the court held, had "caused" Brickey's injury, as Hall was the lone decisionmaker. Id. at *8.

As to Hall, the district court denied qualified immunity. Id. The district court first held that, taking the record in

8

the light most favorable to Brickey, Hall violated Brickey's First Amendment rights. Id. at *4–7. Having found a violation, the district court determined that Brickey's right not to be fired for his speech was clearly established at the time of his termination. Id. at *7–8. Relying on Citizens United v. FEC, 558 U.S. 310 (2010), the court stated that political speech was clearly entitled to strong protection. Id. at *8. And relying on Durham v. Jones, 737 F.3d 291 (4th Cir. 2013), the court stated that public employees' speech regarding governmental misconduct warrants protection. Id.

This interlocutory appeal followed.[1]


II.

We review de novo the denial of qualified immunity. Altman v. City of High Point, 330 F.3d 194, 200 (4th Cir. 2003).

Qualified immunity shields government officials from personal liability when "their conduct does not violate clearly established . . . rights of which a reasonable person would have known." Smith v. Gilchrist, 749 F.3d 302, 307 (4th Cir. 2014)

---

[1] Although "interlocutory appeals are generally disallowed, 'a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is [immediately appealable] notwithstanding the absence of a final judgment,' under the collateral-order doctrine." Iko v. Shreve, 535 F.3d 225, 234 (4th Cir. 2008) (quoting Mitchell v. Forsyth, 472 U.S. 511, 530 (1982)).

(quoting Stanton v. Sims, 134 S. Ct. 3, 4 (2013) (per curiam)). That is, qualified immunity protects government officials when they act in legal "gray areas." Id. (quoting Occupy Columbia v. Haley, 738 F.3d 107, 118 (4th Cir. 2013)). An official is entitled to qualified immunity unless "(1) the allegations underlying the claim, if true, substantiate [a] violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have known." Id. at 308 (quoting Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006)). While a case directly on point is not required for a court to conclude that the law was clearly established, "existing precedent must have placed the . . . constitutional question beyond debate." Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). The burden of proof rests with the official asserting the defense. Durham, 737 F.3d at 299.

Brickey alleges retaliatory discharge in violation of the First Amendment. On appeal, Hall does not challenge the district court's holding that Brickey has properly alleged a constitutional violation—the first qualified-immunity prong. Instead, Hall contends that the right Brickey asserts was not clearly established in 2012 when Brickey was terminated. Our review, therefore, is confined to the question of what law was

10

clearly established—we do not reach the merits of Brickey's constitutional claim.

> A First Amendment retaliation claim poses three questions:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's termination decision.

McVey v. Stacy, 157 F.3d 271, 277-78 (4th Cir. 1998). The third question is not in dispute; Hall concedes that he terminated Brickey because of his speech. But Hall contends that the law was not clearly established on the first two questions.

Because we hold that the law was not clearly established as to the second question—the balancing of the employee's and employer's interests—Hall is entitled to qualified immunity. Consequently, we need not reach the question of whether it was clearly established that Brickey spoke as a citizen on a matter of public concern.

                                A.

Under the Supreme Court's decision in Pickering v. Board of Education, a court's charge in a First Amendment retaliation case is "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in

11

promoting the efficiency of the public services it performs through its employees." 391 U.S. 563, 568 (1968). The public's interest in hearing the employee's speech also weighs in the balance: "A stronger showing of public interest in the speech requires a concomitantly stronger showing of government-employer interest to overcome it." McVey, 157 F.3d at 279 (Murnaghan, J., concurring).[2]

"The Pickering balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." Connick v. Myers, 461 U.S. 138, 150 (1983). Prior to Brickey's termination, the test for striking the appropriate balance was clear:

> "[W]e must take into account the context of the employee's speech" and "the extent to which it disrupts the operation and mission" of the institution. Factors relevant to this inquiry include whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

---

[2] At this point in his concurrence, Judge Murnaghan speaks for a majority of the McVey panel. See 157 F.3d at 282 (Michael, J., concurring in the lead opinion "except to the extent it is qualified by Judge Murnaghan's separate opinion").

12

Ridpath, 447 F.3d at 317 (citation omitted) (quoting McVey, 157 F.3d at 278). The employer need not prove actual disruption, "but only that an adverse effect was 'reasonably to be apprehended.'" Maciarello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992) (quoting Jurgensen v. Fairfax Cty., 745 F.2d 868, 879 (4th Cir. 1984)).

It was clearly established in 2012 that police officials are entitled to impose more restrictions on speech than other public employers because a police force is "'paramilitary'—discipline is demanded, and freedom must be correspondingly denied." Id. (quoting Jurgensen, 745 F.2d at 880) (granting qualified immunity to a police official who terminated two officers for conducting an unauthorized investigation into alleged evidence tampering in the police force). Because of this heightened need for discipline, police officials have "greater latitude . . . in dealing with dissension in their ranks." Id.

The key comments in this case involve the allegedly missing D.A.R.E. funds.[3] As an initial matter, despite Brickey's claim

---

[3] We agree with the district court that it was clearly established that Brickey's other comments were entitled to First Amendment protection. Statements that the department "needs to be more professional," "needs to be more [aggressive] on investigations," or ought to hire an investigator do not raise a reasonable apprehension of disruption. J.A. 337. Not only do these statements offer modest criticism of the department and (Continued)

13

that he did not intend to impugn his chief, Hall could reasonably have read the comments—as some others in Saltville did—to accuse him of incompetence or even malfeasance. A town auditor, for example, read the comments to allege misuse on the Chief's part, and (according to declarations given by Hall, Assistant Chief Puckett, and the town manager) some members of the police force and the public expressed concerns of police misconduct in the wake of the articles. See J.A. 93 (Hall: "Some residents also construed Brickey's comments as accusing me and the department of corruption and misusing funds."); J.A. 312 (Puckett: "I was asked questions about the articles from members of the public who expressed concern that officers were engaging in misconduct."); J.A. 316 (Town Manager: "Officers expressed their belief that Brickey had accused them of improper behavior . . . ."); id. ("Many people who commented about the articles expressed concern that someone was stealing money from the Town.").

The clearly established principles outlined above did not put the outcome of the Pickering balancing in this case "beyond debate." The context and the extent of disruption of the D.A.R.E. comments weighed on both sides of the scale. First,

---

its chief, but they also touch on weaknesses of the department that were already well known in Saltville.

14

Brickey spoke as a political candidate in a public forum. In general terms, speaking as a political candidate weighs in favor of speech. At the same time, however, the public nature of Brickey's comments increased their capacity for disruption. Second, Brickey's speech criticized a superior officer. As our cases reflect, discipline and respect for superior officers are critical in a police force. Because speech accusing a superior officer of incompetence or malfeasance goes to the heart of the superior's authority, Hall could reasonably have believed that Brickey's comments would undermine his authority in the eyes of the public and within the police department. See J.A. 316 (Town Manager stating that "[b]ased on my observations of officers in the Police Department, Brickey's comments hampered morale and discipline in the department"). Such a concern is amplified in the close working conditions of a small police force, where "mutual confidence and co-operation are essential." Cooper v. Johnson, 590 F.2d 559, 562 (4th Cir. 1979). Furthermore, Hall was working to restore credibility to the department. He reasonably could have believed that Brickey's comments would set back his efforts and increase public distrust in him and the department as a whole. Finally, Reynolds conducted an independent investigation of Brickey's statements and concluded that they "were harmful to the public trust of Chief Hall as

15

well as his integrity." J.A. 387. Such a finding supports the conclusion that Hall reasonably apprehended disruption.

In sum, the parties have not directed us to any case that would have clearly warned Hall that terminating Brickey for his comments about the D.A.R.E. funds would violate his First Amendment rights. On the contrary, our case law had stressed the broad discretion granted police officials to limit speech when discipline is at stake. As a result, we cannot say that it was beyond debate that Brickey's interests outweighed Hall's.

B.

Brickey's counter-arguments are unpersuasive. He relies principally on Citizens United v. FEC, 558 U.S. 310 (2010), which held that the government may not prohibit corporate expenditures to support or criticize political candidates. In Brickey's view, "[n]othing could have been more clearly established in May 2012 than the sanctity of political speech." Appellee's Br. at 28. However, such a broadly framed right could not have answered the question facing Hall: when does a police chief's need to maintain discipline and harmony permit him to infringe on an officer's right to make public statements as a political candidate insinuating wrongdoing by a superior officer? See al-Kidd, 563 U.S. at 742 (stating that courts may not "define clearly established law at a high level of generality").

16

While a case directly on point is not required to clearly establish the answer to this question, Citizens United addresses only one side of the Pickering scale, and it does so on very different facts. Cases more closely on point have not treated political speech as inviolate in the public-employment context. See, e.g., Bland v. Roberts, 730 F.3d 368, 391 (4th Cir. 2013) (holding that it was clearly established in 2009 that "a reasonable sheriff could have believed he had the right to choose not to reappoint his sworn deputies for political reasons, including speech indicating the deputies' support for the Sheriff's political opponent"); see also Waters v. Churchill, 511 U.S. 661, 672 (1994) (plurality opinion) ("Even something as close to the core of the First Amendment as participation in political campaigns may be prohibited to government employees.").

Brickey next contends that Hall has nothing on his side of the Pickering scale but "rank speculation," and he likens the anticipated disruption here to that in Smith v. Gilchrist and Durham v. Jones. Appellee's Br. at 31-32.[4] We have already explained that Hall had a "reasonable apprehension" of

---

[4] Both Smith and Durham were published after May 21, 2012 (the date of Brickey's termination), but they held that certain rights were clearly established prior to that date. While the cases could not have assisted Hall, we are nevertheless bound by their holdings.

17

disruption,[5] and we now explain why Smith and Durham are distinguishable.

In Smith, an assistant district attorney ("ADA") running for public office gave a televised interview in which he criticized a local defensive-driving program. 749 F.3d at 305. Because completion of the program allowed ticketed drivers to receive a "prayer for judgment continued," the district attorney's office (the "government") benefitted from the program by a substantially reduced caseload. Id. When the district attorney terminated the ADA's employment soon after the interview, the ADA brought a First Amendment retaliation suit. Id. at 306.

In the district court, the government conceded that the ADA "had forecasted evidence sufficient to establish that his interest in speaking outweighed the government's." Id. at 309. Nevertheless, the government argued that the outcome of the balancing test was not clearly established in the ADA's favor, as the district attorney reasonably could have apprehended that the ADA's criticism of the defensive-driving program would harm

---

[5] Brickey also contends that Hall effectively conceded a lack of disruption by hiring Reynolds to conduct an investigation. We disagree. Hiring an impartial investigator in this circumstance, where Hall felt personally aggrieved, more clearly reflects prudence than a lack of evidence.

18

the district attorney's office by increasing its workload.  Id. at 307.

We rejected the government's argument, relying largely on its prior concession that "[t]here are no relevant facts to challenge [the] finding that [the ADA's] interest in speaking outweighed the government's interest in providing effective and efficient services to the public," but also further noting that the government lacked "any evidence that [it] had any reason to believe that [the ADA's] interview would negatively affect the efficiency or effectiveness of the DA's office."  Id. at 309–10. Here, Hall has not conceded the outcome of the Pickering balancing test, and we have found that Hall, unlike the government in Smith, had reason to believe that Brickey's comments would cause disruption.

In Durham, the right at issue was of public employees to speak out on "serious governmental misconduct," specifically, a police officer's right to accuse "high-ranking law enforcement officials . . . of falsifying law enforcement reports and . . . authorizing aggressive threats against a member of their own agency if he persisted in his opposition to such a practice." 737 F.3d at 303.  Although the employer "paid lip service to ostensible damage to office morale, relationships between colleagues, and the function of the office generally," we found that the employer "was unable to articulate any way in which the

19

office would have been different or was actually different due to [the employee's] statements." 737 F.3d at 302. Indeed, the employer ultimately conceded that he had no reason to think that the employee's speech would prevent the police department from carrying out its mission. Id. We held that the employer's weak evidence of disruption could not outweigh the importance of the employee's speech. Id. ("Serious, to say nothing of corrupt, law enforcement misconduct is a substantial concern that must be met with a similarly substantial disruption in the calibration of the controlling balancing test.").

Durham is not controlling for at least four reasons. First, and most importantly, Hall has not merely "paid lip service" to potential disruption to his police force, as we have already explained. Unlike the employer in Durham, Hall could reasonably have apprehended that the D.A.R.E. comments would undermine his authority.

Second, Brickey's speech did not clearly allege misconduct of the same magnitude as that alleged in Durham. While the possibility that $500 of public funds had been mislaid or even misused may well have been significant to the citizens of Saltville, Hall could reasonably have believed that it was not the kind of "serious governmental misconduct" that our case law had protected. Durham involved clear accusations that high-ranking police officials were forcing officers to falsify

20

reports of incidents involving the officers' use of force.  Id.
at 296.  Such a core abuse of the mission of a police department
is reasonably distinguishable from vague allegations of
mismanagement and even misuse of funds.[6]

Third, Brickey claimed during the Reynolds investigation
that he never intended to accuse Hall of any wrongdoing.  The
employee in Durham, by contrast, made unmistakable allegations
of misconduct with the intention of exposing the wrongdoing and
alerting the public.  Knowing that Brickey did not intend to
expose misconduct, Hall could reasonably have believed that
Brickey's speech did not deserve the same protection as that of
a whistleblower.

Fourth, Hall knew from the Reynolds investigation that
Brickey's statements about the misuse of funds proved
misleading.  As Brickey admitted, the D.A.R.E. funds were not

---

[6] In holding that it was clearly established that the First
Amendment protects allegations of "serious governmental
misconduct," Durham relies on Robinson v. Balog, 160 F.3d 183
(4th Cir. 1998).  In Balog, which was available to Hall, public-
works employees suffered retaliation for their allegations that
a contributor to the mayor's reelection campaign was illegally
rewarded with a contract to repair a landfill leachate pond and
subsequently failed to make the needed repairs.  Id. at 184–85.
That these allegations of blatant, large-scale corruption
endangering public health were protected, see id. at 185, did
not clearly establish protection for Brickey's statements.
Moreover, as in Smith and Durham, we based our decision to deny
qualified immunity in large part on "the lack of evidence
supporting the [government's] interest in disciplining [the
employees] for their speech."  Id. at 189.

missing, and there were no improper charges to the account.[7] The employee in Durham did not make such a concession to the employer before his termination. Hall could reasonably have believed that the inaccuracy of Brickey's statements reduced their value and increased his own interests in suppressing future statements of the same kind. See Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 52 (1988) ("False statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective."); Piver v. Pender Cty. Bd. of Educ., 835 F.2d 1076, 1081 (4th Cir. 1987) (noting an employer's need for "protection from false

---

[7] After oral argument, Brickey submitted a letter bringing to our attention the Supreme Court's recent decision in Heffernan v. City of Paterson, 136 S. Ct. 1412 (2016). See Fed. R. App. P. 28(j). In Heffernan, "a government official demoted an employee because the official believed, but incorrectly believed, that the employee had supported a particular candidate for mayor." 136 S. Ct. at 1416. The Court held that even though the employee had not supported the candidate—and therefore had not engaged in a constitutionally protected activity—he nevertheless was entitled to bring a First Amendment retaliation claim because "the government's reason for demoting [an employee] is what counts." Id. at 1418. According to Brickey, Heffernan establishes the broad rule that "a mistake of fact does not defeat a First Amendment retaliation claim," even when an employee makes factually inaccurate claims regarding his employer. See Appellee's 28(j) Letter. Heffernan lends Brickey no support. Not only does the case assume without deciding the merits of the First Amendment claim, see id. at 1419, but more to the point, it simply does not address the issue of factually inaccurate employee speech.

22

accusations that may prove difficult to counter given the employee's supposed access to inside information").

III.

We hold that it was not clearly established on the date of Brickey's termination that his speech interests as a citizen outweighed Hall's interests as an employer. Hall is therefore entitled to qualified immunity. Accordingly, we reverse the district court's denial of summary judgment and remand for entry of an order consistent with this opinion.

REVERSED AND REMANDED