**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 15-2153**

_____

JAMES LANE,

        Plaintiff - Appellant,

    v.

SHERIFF JOHN W. ANDERSON; MAYOR & CITY COUNCIL OF BALTIMORE,

        Defendants – Appellees,

    and

 COL. MARCUS L. BROWN,

        Defendant.

------------------------

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MARYLAND;
PUBLIC JUSTICE CENTER, INC.,

        Amici Supporting Appellant.

_____

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  Richard D. Bennett, District Judge.
(1:14-cv-03739-RDB)

_____

Argued:  May 12, 2016        Decided:  August 17, 2016

_____

Before KING, DIAZ, and THACKER, Circuit Judges.

Affirmed in part, reversed in part, and remanded by unpublished per curiam opinion.

---

**ARGUED:** Howard Benjamin Hoffman, Rockville, Maryland, for Appellant. Jason L. Levine, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Annapolis, Maryland; Jason Robert Foltin, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees. **ON BRIEF:** Steven H. Goldblatt, Director, Shon Hopwood, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee Anderson. George A. Nilson, City Solicitor, William R. Phelan, Jr., Chief Solicitor, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellee Mayor and City Council of Baltimore. Deborah A. Jeon, Sonia Kumar, Nicholas Steiner, AMERICAN CIVIL LIBERTIES UNION OF MARYLAND, Baltimore, Maryland; Debra Gardner, Tassity Johnson, PUBLIC JUSTICE CENTER, Baltimore, Maryland, for Amici American Civil Liberties Union Foundation of Maryland and Public Justice Center.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

James Lane ("Appellant") appeals the district court's dismissal of his complaint against the Mayor and City Council of Baltimore ("Baltimore City") and the Sheriff of Baltimore City, John W. Anderson in his official and individual capacities ("Sheriff Anderson") (collectively, "Appellees"). Appellant, a deputy sheriff at the time, was shot in the face during the execution of an arrest warrant. After the shooting incident, Appellant voiced doubts, alleging possible friendly fire and an official cover-up of that possibility, and thereafter, Sheriff Anderson fired him. Appellant then sued Appellees, claiming a violation of his First Amendment rights.

The district court dismissed Appellant's complaint, holding that it lacked subject matter jurisdiction, Sheriff Anderson was entitled to qualified immunity and Eleventh Amendment immunity, and Baltimore City was not liable for Sheriff Anderson's employment actions because he was not a final policymaker for Baltimore City.

For the reasons that follow, we affirm the dismissal of Appellant's claim against Baltimore City. But because subject matter jurisdiction exists and Sheriff Anderson is not entitled to immunity, we reverse and remand in all other respects.

3

I.

A.

Appellant became a deputy sheriff with the Baltimore City Sheriff's Office ("BCSO") in 2003. On September 15, 2008, while executing an arrest warrant with other law enforcement officers from the Warrant Apprehension Task Force, Appellant suffered a gunshot wound to the face. Purportedly, the subject of the arrest warrant (the "Suspect") shot Appellant. Another officer then shot the Suspect, killing him. The subsequent internal investigation of the incident concluded that it was the Suspect who shot Appellant. But Appellant still had his doubts, as he suspected another law enforcement officer accidentally shot him. When Appellant expressed his concerns to his superiors, they "told him to forget about it." J.A. 8.[1] When Appellant and two other deputy sheriffs continued to question the shooting, they were all transferred out of the task force.

On December 15, 2010, Appellant expressed his reservations about the shooting in interviews with certain media outlets -- namely, Fox 45 News (television) and "Investigative Voice" (web-based). The interviews revealed not only Appellant's doubts about the investigation, but also his

_____

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

suspicion about a potential cover-up. Appellant also expressed his belief that the other officer he suspected had accidentally shot him lied about the incident because that officer had failed a polygraph examination.

Three months later, in March 2011, the BCSO administratively charged Appellant with six counts of prohibited conduct stemming from his interviews with the media. Ultimately, in December 2011, a hearing board found Appellant guilty of five of the six charges, including two counts for engaging in conduct that reflected unfavorably upon the BCSO, two counts for representing the BCSO without permission, and one count for publicly criticizing the BCSO. He was found not guilty of making a false statement. The hearing board made a non-binding recommendation of a five-day suspension without pay to Sheriff Anderson.

Sheriff Anderson declined to follow the recommendation and instead terminated Appellant. In explaining this decision, Sheriff Anderson said that he could "no longer trust [Appellant's] reliability and [Appellant's] credibility"; Appellant's violations brought the BCSO "into disrepute"; Appellant's appearances on television and the internet displayed "sullenness and anger" towards the BCSO; Appellant's criticisms and accusations of another officer lying were "divisive[] [and] disloyal to the mission of the [BCSO] and intended to undermine

5

the effective operation of the [BCSO]"; and Appellant had "become a polarizing force within the [BCSO]." J.A. 177-78.

B.

Appellant appealed his termination to the Maryland Circuit Court for Baltimore City, asserting that he was found guilty despite insufficient evidence, and that he was terminated for conduct that was both not charged and outside the record. The Maryland Circuit Court reversed the termination and ordered reinstatement, but on appeal, the Court of Special Appeals of Maryland, which considered "only . . . the ultimate sanction imposed," J.A. 72, upheld Appellant's termination.

Thereafter, on December 1, 2014, Appellant filed a complaint in the United States District Court for the District of Maryland against Sheriff Anderson, in his official and individual capacities, and Baltimore City.[2] Pursuant to 42 U.S.C. § 1983, Appellant claimed retaliatory discharge in violation of his First Amendment right to freedom of speech. Additionally, he claimed violations of the Maryland Declaration of Rights. Appellant sought injunctive relief to permit his

_____

[2] Appellant also alleged that Colonel Marcus Brown, in his official capacity as the chair of the Maryland Police Training Commission, violated his First Amendment rights and his due process rights. The district court granted Appellant's motion to voluntarily dismiss the claims against Colonel Brown on August 13, 2015. Accordingly, these respective allegations are no longer part of the complaint on appeal.

6

reinstatement as a deputy sheriff, declaratory relief, and money damages.

Appellees moved to dismiss the complaint, and the district court granted the motions. See Lane v. Anderson, No. 1:14-cv-3739, 2015 WL 5136035 (D. Md. Sept. 1, 2015). The district court, reasoning that Appellant was seeking federal review of a state-court decision, held that it lacked subject matter jurisdiction over Appellant's injunctive relief claims pursuant to the Rooker-Feldman[3] doctrine. See id. at *8.

The district court further concluded that Sheriff Anderson, in his individual capacity, was entitled to qualified immunity because, at the time he terminated Appellant, the law was not clearly established that doing so was a violation of Appellant's First Amendment rights. See Lane, 2015 WL 5136035, at *6-7. Finally, the district court determined Sheriff Anderson enjoyed Eleventh Amendment immunity from the claim for monetary damages brought against him in his official capacity because, pursuant to Maryland law, he was an arm of the state. See id. at *4-6.

As for Baltimore City's involvement, the district court reasoned that Baltimore City could not be liable for

---

[3] See D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923).

7

Sheriff Anderson's actions because Sheriff Anderson was a Maryland official, not an official acting on behalf of Baltimore City.[4]  See Lane, 2015 WL 5136035, at *8.

Appellant timely appealed.

II.

Subject Matter Jurisdiction

A.

As an initial matter, Appellant challenges the district court's determination that it lacked subject matter jurisdiction.  Because the jurisdictional question is a "threshold issue," we address it before proceeding to the merits of the appeal.  Elyazidi v. SunTrust Bank, 780 F.3d 227, 232 (4th Cir. 2015).  We review challenges to subject matter jurisdiction de novo.  See Flame S.A. v. Freight Bulk Pte. Ltd., 807 F.3d 572, 580 (4th Cir. 2015).

---

[4] As for the state law claim pursuant to the Maryland Declaration of Rights against Baltimore City, the district court concluded that because Sheriff Anderson was not a Baltimore City employee, Baltimore City could not be liable.  See Lane v. Anderson, No. 1:14-cv-3739, 2015 WL 5136035, at *9 (D. Md. Sept. 1, 2015).  Appellant does not challenge on appeal the dismissal of Baltimore City's liability premised on the Maryland Declaration of Rights.  Accordingly, that argument is waived. See United States v. Avila, 770 F.3d 1100, 1104 n.1 (4th Cir. 2014) (failing to raise an argument in the opening briefs constitutes an abandonment of that issue).

B.

Appellant argues that the Rooker-Feldman doctrine, which would deprive us of jurisdiction if applicable, does not apply here because he is not challenging the state court's decision. See Davani v. Va. Dep't of Transp., 434 F.3d 712, 718 (4th Cir. 2006). Rather, he seeks relief for the termination that Sheriff Anderson imposed upon him. We agree.

Pursuant to the Rooker-Feldman doctrine, district courts are generally barred from reviewing state-court decisions. See D.C. Court of Appeals v. Feldman, 460 U.S. 462, 483 n.16 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16 (1923). Notwithstanding that premise, federal courts may still entertain claims the state court examined, so long as those claims do not challenge the state-court decision itself. See Elyazidi, 780 F.3d at 233 (claims not challenging the state-court judgment do not present a jurisdictional bar). Instead, "[t]he Rooker–Feldman doctrine . . . is confined to cases . . . brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005) (emphasis supplied). So, "[i]f [the state-court loser] is not challenging

9

the state-court decision, the Rooker-Feldman doctrine does not apply." Davani, 434 F.3d at 718.

Here, Appellant is not challenging the Maryland court's decision or judgment, but rather the injury that Sheriff Anderson imposed, that is, Appellant's termination. See Exxon, 544 U.S. at 284. In Davani, a state employee challenged his termination for discrimination and retaliation, and the administrative agency upheld the termination. See Davani, 434 F.3d at 715. The state court dismissed his appeal, and the employee filed a complaint in federal court alleging retaliation and discrimination, which thereafter was dismissed for lack of subject matter jurisdiction pursuant to the Rooker-Feldman doctrine. See id. We reversed, concluding that the employee was not "seek[ing] redress for an injury caused by the state-court decision itself," id. at 718, but rather for the injury that the employer caused when it terminated the employee, see id. at 719.

Like in Davani, the state-court judgment here did not cause Appellant's injury when it upheld Sheriff Anderson's decision to terminate Appellant. Appellant's complaint does not allege that the state court caused the injury, and instead, he alleges that Sheriff Anderson caused his termination, an event that happened prior to the state-court decision. Accordingly, we hold that Appellant's claims are not barred by

10

Rooker-Feldman, and therefore, federal subject matter jurisdiction remains intact.

## III.

### Qualified Immunity

#### A.

On a motion to dismiss pursuant to qualified immunity, we review the district court's conclusion de novo. See Occupy Columbia v. Haley, 738 F.3d 107, 115 (4th Cir. 2013). The official asserting qualified immunity carries the burden of establishing his right to it. See Durham v. Jones, 737 F.3d 291, 299 (4th Cir. 2013).

#### B.

In assessing whether Sheriff Anderson was entitled to qualified immunity, the district court assumed that terminating Appellant in retaliation for speaking to the media violated a right protected by the First Amendment, but held that the right was not clearly established when the violation occurred. See Lane v. Anderson, No. 1:14-cv-3739, 2015 WL 5136035, at *7 (D. Md. Sept. 1, 2015). Therefore, the district court held Sheriff Anderson was entitled to qualified immunity. See id. This holding is contrary to our precedent.

#### C.

When a government official is sued in his individual capacity, he may be entitled to a qualified immunity defense.

11

See Bland v. Roberts, 730 F.3d 368, 391 (4th Cir. 2013). However, qualified immunity is not bestowed when "(1) the allegations underlying the claim, if true, substantiate [a] violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have known." Smith v. Gilchrist, 749 F.3d 302, 308 (4th Cir. 2014) (alteration in original) (quoting Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006)); see also Saucier v. Katz, 533 U.S. 194 (2001). A clearly established right exists when "existing precedent . . . place[s] the . . . constitutional question beyond debate." Gilchrist, 749 F.3d at 308 (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011)). When the official acts in legal "gray areas," he is entitled to qualified immunity. Id. at 307.

With these principles in mind, we address the qualified immunity inquiry, considering first the constitutional right at issue, and second, whether this right was clearly established when the alleged violation occurred.

1.

First Amendment Right

The First Amendment protects "the right to be free from retaliation by a public official for the exercise of [freedom of speech]." Gilchrist, 749 F.3d at 308 (internal quotation marks omitted). However, this right is not limitless,

12

particularly for public employees. See id. (citing McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998)). "[T]he government, as an employer, 'is entitled to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies,'" and therefore has "an interest in regulating the speech of its employees." Id. (quoting McVey, 157 F.3d at 277). As the Supreme Court explained in Pickering v. Board of Education, 391 U.S. 563 (1968),

> The problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

391 U.S. at 568. Finally, when an employee asserts a § 1983 retaliation claim based on his exercise of free speech, we analyze the claim using the following three queries:

> (1) [W]hether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest;

> (2)[W]hether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and

> (3) [W]hether the employee's speech was a substantial factor in the employee's termination decision.

McVey, 157 F.3d at 277-78. The first two prongs present questions of law to be resolved by the court, and the third

13

prong is a question of fact best resolved on "summary judgment only in those instances when there are no causal facts in dispute." Love-Lane v. Martin, 355 F.3d 766, 776 (4th Cir. 2004).

a.

With respect to the first McVey prong, we cannot agree with Sheriff Anderson that Appellant stated his concerns merely as a self-serving complaint. Rather, Appellant, as a private citizen, spoke on a matter of public concern when he questioned a police shooting, which resulted in a fatality, and the subsequent investigation.

When Appellant communicated with the media, he was acting outside the scope of his duties as a deputy sheriff. Although Appellant's "expressions related to [his] job," the First Amendment affords him protection when he conveys these views as a private citizen. Garcetti v. Ceballos, 547 U.S. 410, 421 (2006). It is "antithetical to our jurisprudence to conclude . . . speech by public employees regarding information learned through their employment [] may never form the basis for a First Amendment retaliation claim". Hunter v. Town of Mocksville, 789 F.3d 389, 396-97 (4th Cir. 2015).

Appellant's speech was not just an airing of a personal grievance. It was a matter of public concern.

14

> Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.

Lane v. Franks, 134 S. Ct. 2369, 2380 (2014) (internal quotation marks omitted). We consider the character of speech in this regard by taking into account "the content, form, and context of a given statement." Durham, 737 F.3d at 299 (quoting Connick v. Myers, 461 U.S. 138, 147-48 (1983)). "Matters relating to public safety are quintessential matters of public concern." Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 353 (4th Cir. 2000). By contrast, comments properly characterized as personal grievances "about conditions of employment" are not matters of public concern. Durham, 737 F.3d at 300 (internal quotation marks omitted).

The content of Appellant's speech here was undeniably a matter of public concern. He questioned a shooting in which a suspect was killed (and Appellant himself injured). He questioned an allegedly botched investigation, which he suspected was cloaked in a police cover-up. And he ultimately questioned whether friendly fire occurred, as opposed to the Suspect having allegedly shot him, which resulted in the Suspect's death.

15

The form and context of Appellant's speech further strengthens the conclusion that Appellant spoke on a matter of public concern. Appellant spoke to a broad audience, through both television and internet. Clearly, Appellant's story interested the local press, and in two different mediums, no less. See Durham, 737 F.3d at 301 (explaining "interest[] [from] the media indicates that [the issue] was of public interest"); Robinson v. Balog, 160 F.3d 183, 188 (4th Cir. 1998) (public dissemination through press shows matter of public concern).

For these reasons, we hold that Appellant's speech satisfied the first McVey prong as protected speech.

b.

With respect to the second prong, we must assess whether Appellant's interest in speaking about the September 2008 shooting and the subsequent internal investigation outweighs the government's legitimate interest in providing efficient public services. See Gilchrist, 749 F.3d at 308. It is the government's burden to justify the termination on legitimate grounds. See id. at 309. As we explained in Ridpath, we evaluate the government's interests utilizing the following factors:

> [W]hether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among

16

coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

447 F.3d at 317. In this context, law enforcement agencies are afforded some leeway to restrict their employees' speech because "they are paramilitary -- discipline is demanded, and freedom must be correspondingly denied." Durham, 737 F.3d at 301 (internal quotation marks omitted). And, "[a] stronger showing of public interest in the speech requires a concomitantly stronger showing of government-employer interest to overcome it." McVey, 157 F.3d at 279 (Murnaghan, J., concurring).

Moreover, the government need not "prove that the employee's speech actually disrupted efficiency"; rather, its burden is to show "an adverse effect was reasonably to be apprehended." Gilchrist, 749 F.3d at 309 (internal quotation marks omitted); see also Durham, 737 F.3d at 302 (stating that more than "vague references" and "lip service to ostensible damage" to morale, relationships, and general office functionality is necessary).

17

Here, as previously discussed, Appellant's speech dealt with a matter of public concern: he suspected friendly fire ultimately resulted in a person being killed, and yet, when he voiced that suspicion, he was told not to worry about uncovering the truth. Akin to our holding in Durham, the facts here do not tip the balance in favor of Appellees. See 737 F.3d at 302-03. To the contrary.

As for the Government, Sheriff Anderson has spoken of Appellant's alleged effect on the office in mere generalities. He has offered no concrete examples to back up his claim that Appellant brought "disrepute" to the agency, and was divisive, disloyal, and a "polarizing force." J.A. 73. Sheriff Anderson has asserted nothing more than "lip service" and "vague references" in this regard. Durham, 737 F.3d at 302 (explaining that a showing of an actual disruption is not needed, and, at the same time, indicating an articulation of "a reasonable apprehension of such a disruption" is required).

Ultimately, at the motion to dismiss stage, based upon these generalized statements, we cannot conclude that Sheriff Anderson has met his burden of justifying the Appellant's termination on legitimate grounds, particularly considering the significant public interests raised by Appellant. See Gilchrist, 749 F.3d at 309.

The third McVey prong, which presents an issue of fact as to whether Appellant's speech was "a substantial factor" in his termination, can be swiftly dispensed. McVey, 157 F.3d at 277-78. When reviewing a Rule 12(b)(6) motion to dismiss, we view the facts in the light most favorable to Appellant. When dealing with a First Amendment retaliation claim in this posture, we generally infer causation based on the facts alleged in the complaint because, at the motion to dismiss stage, "we are unable and unwilling to speculate as to the outcome." Tobey v. Jones, 706 F.3d 379, 391 (4th Cir. 2013).

Here, as in Tobey, Appellant has adequately set forth a plausible claim that his First Amendment rights were violated when his comments directly precipitated his firing. As a direct result of his media interviews, Appellant faced internal charges, and ultimately termination. Sheriff Anderson's stated basis for terminating Appellant included the fact that Appellant had commented publicly about the internal investigation. In fact, Sheriff Anderson said, "I find that . . . . [Appellant's] appearance on television, [and] on the website, [were] disrespectful, accusatory, and . . . displayed an attitude of sullenness and anger towards the [BCSO]. . . . Nothing short of termination will permit the division and discord caused by [Appellant's] conduct to heal." J.A. 177-78. Thus, we readily

conclude that Appellant's speech was "a substantial factor" that led to his firing. McVey, 157 F.3d at 277-78.

## 2.

### Clearly Established Right

Having concluded that Appellant's speech should be accorded First Amendment protection, we now turn to the second prong of the qualified immunity analysis: whether every reasonable official would have known that terminating Appellant for speaking out would be in violation of his First Amendment rights. See Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam). Appellees maintain that Maryland state law, specifically the Law Enforcement Officers' Bill of Rights, expressly provides that the law enforcement agency's chief -- here, Sheriff Anderson -- is permitted to punish Appellant for "divulg[ing] information" that is contrary to the department's policy. Appellees' Br. 28. If Sheriff Anderson complied with this express statutory right, Appellees' argument goes, "he had no reason to doubt the constitutionality of the policies." Id. at 29. But, the position urged by Appellees, and adopted by the district court, that the Sheriff was acting within his legal authority because he was acting pursuant to Maryland law, ignores clearly established precedent. See Lane, 2015 WL 5136035, at *7.

Sheriff Anderson's adherence to state law is not helpful here. An independent basis for sanctions does not provide a shield from liability when the speech is constitutionally protected. See Durham, 737 F.3d at 304; Am. Civ. Liberties Union of Md., Inc. v. Wicomico Cty., 999 F.2d 780, 785 (4th Cir. 1993) (per curiam) (recognizing "[r]etaliation by a public official for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper").

More significantly, years before Sheriff Anderson terminated Appellant, there was ample authority reinforcing the notion that Appellant's speech was of the type that was afforded protection. See Durham, 737 F.3d 291; Andrew v. Clark, 561 F.3d 261 (4th Cir. 2009); see also Hunter, 789 F.3d at 402 (holding that the law was clearly established in December 2011 that speech about serious misconduct was protected).

In Andrew -- decided two years before the incident at issue -- we held that a police commander in the Baltimore Police Department stated a First Amendment claim when he alleged that he was terminated for leaking information to the media about a police-involved shooting and its investigation. See Andrew, 561 F.3d at 263. In Durham, the right at issue was of a deputy sheriff to speak out on "serious governmental misconduct,"

21

specifically, his right to accuse "high-ranking law enforcement officials . . . of falsifying law enforcement reports and . . . authorizing aggressive threats against a member of their own agency if he persisted in his opposition to such a practice." Durham, 737 F.3d at 303. There, we held, "[w]e have been clear that where public employees are speaking out on government misconduct, their speech warrants protection." Id. at 303 (citing Balog, 160 F.3d at 189).

Thus, when Sheriff Anderson terminated Appellant in 2012, the law was not in any "gray area[]." Gilchrist, 749 F.3d at 307. Rather, the law was clearly established. After our decisions in Andrew and Durham, no reasonable official could have believed that a law enforcement officer's statements to media outlets regarding misconduct and corruption surrounding a police-involved shooting lacked First Amendment protection. Therefore, we hold that Sheriff Anderson is not entitled to qualified immunity, and Appellant can continue to press the damages claim brought against Sheriff Anderson in his individual capacity.[5]

---

[5] We note that this case is unlike Brickey v. Hall, where we held that a police chief was entitled to qualified immunity after he had been sued under § 1983 for terminating a subordinate in violation of the First Amendment. No. 14-1910, 2016 WL 3648462, at *1 (4th Cir. July 8, 2016) (published opinion). In Brickey, a police officer who was running for a town council seat made statements in two newspapers that
(Continued)

22

IV.

Eleventh Amendment Immunity

A.

"Whether an action is barred by the Eleventh Amendment is a question of law that we review de novo." Hutto v. S. Carolina Ret. Sys., 773 F.3d 536, 542 (4th Cir. 2014).

B.

We next address the Eleventh Amendment immunity defense raised by Sheriff Anderson in his official capacity.

The Eleventh Amendment protects a state entity from suit in federal court. See U.S. Const., amend. XI. This protection is also accorded to "state agents and state instrumentalities," or in other words, arms of the state.

---

suggested that the police chief misused -- either through negligence or malfeasance -- $500 in the Drug Abuse Resistance Education ("D.A.R.E.") budget. Id. at *1, *5. After commissioning an independent investigation into the officer's statements, the police chief terminated him. Id. at *2–3.

There are at least four key differences between Brickey and the instant case. First and most notably, the misconduct Appellant alleges is far more serious than the misconduct alleged in Brickey. Second, unlike Sheriff Anderson, the police chief in Brickey did more than merely "'pa[y] lip service' to potential disruption to his police force." Id. at *7. Third, the allegations in Brickey were shown to be false. Id. at *8. Finally, unlike Appellant, the officer in Brickey did not intend to accuse the police chief of wrongdoing. Id. Based on these differences -- which also distinguished Brickey from Durham, id. at *7–8 -- Brickey does not control our decision here.

23

*Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *see* *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). Yet, not every entity exercising a "slice of state power" is entitled to protection, *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 400-01 (1979), and immunity "does not extend to counties and similar municipal corporations," *Mt. Healthy*, 429 U.S. at 280.

"Whether an entity is an arm of the state is ultimately a question of federal law, '[b]ut that federal question can be answered only after considering the provisions of state law that define the agency's character.'" *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 138 (4th Cir. 2014) (quoting *Doe*, 519 U.S. at 429 n.5).

The district court held that Sheriff Anderson enjoyed Eleventh Amendment immunity because he was a state officer. However, the district court came to this conclusion without analyzing the test we have outlined for such a determination. *See* *Lane v. Anderson*, No. 1:14-cv-3739, 2015 WL 5136035, at *6 (D. Md. Sept. 1, 2015); *Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n*, 822 F.2d 456, 457–58 (4th Cir. 1987).

In assessing whether an entity is state or local in character, we have employed the four-factor test described in *Ram Ditta*, 822 F.2d at 457–58. The first factor to be

24

considered is "whether the state treasury will be responsible for paying any judgment that might be awarded." Id. at 457; see Cash v. Granville Cty. Bd. of Educ., 242 F.3d 219, 223 (4th Cir. 2001). We have concluded that a judgment's effect on the state treasury, though still "of considerable importance, does not deserve dispositive preeminence." Oberg, 745 F.3d at 137 n.4 (internal quotation marks and citations omitted); cf. Cash, 242 F.3d at 223; Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 48 (1994) (stating treasury factor is "the most salient factor in Eleventh Amendment determinations"). The other three Ram Ditta factors are: "[W]hether the entity exercises a significant degree of autonomy from the state, whether [the entity] is involved with local versus statewide concerns, and how [the entity] is treated as a matter of state law." Ram Ditta, 822 F.2d at 457-58 (internal footnotes omitted).

Upon consideration of all of these factors, we must "determine whether the governmental entity is so connected to the State that the legal action against the entity would . . . amount to 'the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" Cash, 242 F.3d at 224 (quoting Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 58 (1996)).

Here, the district court admittedly did not engage in the Ram Ditta analysis at all: "[T]his Court need not apply the

25

Ram Ditta test to the subject action. Maryland Code and case law make clear that sheriffs are state officers, with authority derived from state law." Lane, 2015 WL 5136035, at *6. The district court based its reasoning on the fact that sheriffs are elected state officials, see Md. Const. art. IV, § 44; are defined as "state personnel" for the purposes of the Maryland Tort Claims Act, see Md. Code Ann., State Gov't § 12-101(a)(6), Rucker v. Harford Cty., 558 A.2d 399, 412 (Md. 1989); are granted authority by state law to hire deputy sheriffs, see Md. Code Ann., Cts. & Jud. Proc. § 2-309(d)(1)(ii); and are state officials, not local government officials, see Lane, 2015 WL 5136035, at *5 (citing cases).

Yet, this is only part of the analysis, and the district court's failure to apply the proper legal framework was erroneous. See Gray v. Laws, 51 F.3d 426, 434–35 (4th Cir. 1995) (remanding when the district court did not "undertake the appropriate Eleventh Amendment analysis"). As a result, we reverse and remand the district court's holding in this regard so that it can fully consider the issue pursuant to the proper Ram Ditta test.

26

V.

Baltimore City's Liability

A.

We review the district court's grant of a motion to dismiss de novo, accepting as true all well-pled facts in the complaint and construing them in the light most favorable to the plaintiff.  See SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 422 (4th Cir. 2015).

B.

Appellant asserts that the district court erred in dismissing his claim against Baltimore City on the theory that Sheriff Anderson was acting as the Baltimore City policymaker in making BCSO employment decisions.  Therefore, Appellant contends, Baltimore City can also be held liable for his termination.  We disagree.

In Monell v. Department of Social Services of New York, the Supreme Court held that a municipality (a local government entity) may be liable for a constitutional violation pursuant to § 1983 if a plaintiff can show "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" resulted in a constitutional violation.  436 U.S. 658, 690 (1978) (stating that municipalities are "persons" subject to suit pursuant to § 1983).  This "'official policy' requirement was intended to

27

distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." Riddick v. Sch. Bd. of Portsmouth, 238 F.3d 518, 523 (4th Cir. 2000) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986)). Municipal liability results when the acts have been "officially sanctioned or ordered" by the municipality. Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (quoting Pembaur, 475 U.S. at 480).

Under appropriate circumstances, a single decision by a policymaker can result in municipal liability. See Pembaur, 475 U.S. at 480. "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Id. at 481; see also McMillian v. Monroe Cty., 520 U.S. 781, 784-85 (1997) ("A court's task is to identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." (internal quotation marks omitted)); Love-Lane, 355 F.3d at 782.

"To qualify as a 'final policymaking official,' a municipal official must have the responsibility and authority to implement final municipal policy with respect to a particular course of action." Riddick, 238 F.3d at 523 (quoting Pembaur,

28

475 U.S. at 483); see also Spell v. McDaniel, 824 F.2d 1380, 1386 (4th Cir. 1987) ("'[P]olicymaking authority' implies authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government.").

Here, Baltimore City "does not dispute that Sheriff Anderson has final policymaking authority" for employment matters relating to those decisions within the BCSO. Appellees' Br. 7; see also Pembaur, 475 U.S. at 483. However, the issue lies in whether Sheriff Anderson made the unfavorable employment decision for Baltimore City.

C.

In determining whether Sheriff Anderson acted as the final policymaker for Baltimore City, our analysis "is guided by two principles." McMillian, 520 U.S. at 785. First, "the question is not whether [a sheriff] acts for [the state] or [a county] in some categorical, 'all or nothing' manner." Id. Rather, the question is whether the sheriff was a final policymaker "for the local government in a particular area, or on a particular issue." Id.

Second, we resolve this issue based upon state law, "[r]eviewing the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737

29

(1989) (internal quotation marks omitted). "[S]imply labeling as a state official an official who clearly makes county policy" cannot answer the question. McMillian, 520 U.S. at 786; see Dotson v. Chester, 937 F.2d 920, 928 (4th Cir. 1991) ("[T]he Sheriff is not always a state employee or always a county employee. He may, on occasion, be both, or sometimes one and sometimes the other. It all depends on the particular function the Sheriff is performing."); Rucker v. Harford Cty., 558 A.2d 399, 406 (Md. 1989) ("This conclusion does not mean that, for some purposes and in some contexts, a sheriff may not be treated as a local government employee.").

Here, we conclude that, as a matter of Maryland law, Sheriff Anderson is not a final policymaker for Baltimore City. State law, rather than the local government, provides Sheriff Anderson with his power. See Md. Const. art. IV, § 44 (stating that the sheriff "in each county and in Baltimore City" shall "exercise such powers and perform such duties as now are or may hereafter be fixed by law"); Prince George's County v. Aluisi, 731 A.2d 888, 894 (Md. 1999) (explaining that, pursuant to the Maryland Constitution, "the duties of the sheriffs are those prescribed by the common law, the enactments of the General Assembly, and the rules of the Court of Appeals"). Moreover, the Court of Appeals of Maryland has explained that the duties of sheriffs "are determined by state law, not locally enacted

30

ordinances." Aluisi, 731 A.2d at 895. And here, the Charter of Baltimore City does not include the sheriff's department as a principal agency of Baltimore City, or more generally, even reference the sheriff's position or the sheriff's department within its provisions. See generally Charter of Balt. City art. I to IX.

With respect to a sheriff's personnel decision-making authority, state law establishes the authority for hiring and discipline, including termination processes. See Md. Code Ann., Cts. & Jud. Proc. § 2-309(d)(1)(viii) (requiring the sheriff to "select[] [his deputy sheriffs] according to the provisions of the State Personnel and Pensions Article"); Md. Code Ann., Pub. Safety § 3-102(c) (providing the Law Enforcement Officers' Bill of Rights "does not limit the authority of the [sheriff] to regulate the competent and efficient operation and management of a law enforcement agency by any reasonable means including transfer and reassignment if . . . the [sheriff] determines that action to be in the best interests of the internal management of the law enforcement agency"); Md. Code Ann., Pub. Safety § 3-108(d) (granting chief of law enforcement agency authority to make final decision regarding discipline of subordinate officers subject to certain procedural requirements mandated by Sections 3-101 to -109 of the Code of Maryland); Md. Code Ann., St. Pers. & Pens. § 11-104 (granting the sheriff power to take

31

disciplinary actions, including demotion and termination, against any employee).

Further, although state law does not conclusively establish the state's liability for a judgment against Sheriff Anderson in a § 1983 claim, it indicates that, in a tort claim brought pursuant to state law, the state, as opposed to Baltimore City, would cover a judgment against the sheriff based on his personnel decisions. See generally Md. Code Ann., State Fin. & Proc. § 9-108 (providing that, pursuant to the Maryland Tort Claims Act, the state of Maryland, and not Baltimore City, is liable for tort claims against a sheriff for those claims relating to "personnel and other administrative activities"); Rucker, 558 A.2d at 401 (though not deciding whether sheriffs were state or local employees for federal purposes, which was not before the court, holding sheriffs are state personnel pursuant to the Maryland Tort Claims Act -- and thus the state bore responsibility for judgments). This suggests that personnel decisions do not create local municipal liability and are not paid by the local government entity. See State v. Card, 656 A.2d 400, 402–03 (Md. Ct. Spec. App. 1995) (explaining that in the early 1990s, the Maryland legislature amended the Maryland code "to sort out the various functions performed by sheriffs and their deputies throughout the State . . . and to provide an umbrella of State protection, with the cost of that

32

protection to be assessed to the State or the county, depending on the function involved").

In sum, we hold that Sheriff Anderson did not act as a Baltimore City policymaker when making employment and personnel decisions. Accordingly, Appellant's <u>Monell</u> claim was properly dismissed.[6]

VI.

For the reasons set forth herein, we affirm the judgment of district court to the extent it dismisses Appellant's claim against Baltimore City. In all other respects, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

<u>AFFIRMED IN PART,</u>
<u>REVERSED IN PART,</u>
<u>AND REMANDED</u>

---

[6] We note that our resolution of the <u>Monell</u> liability issue does not resolve the Eleventh Amendment immunity question that the district court will consider on remand. <u>See</u> <u>Gray</u>, 51 F.3d at 435 (explaining that the district court erred by "appl[ying] in the Eleventh Amendment context principles applicable only under section 1983").

33